HARRY H. KEM, JR., AND DIANE C. KEM, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

CHARLES E. MILLER AND MARY J. MILLER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3169-67, 3170-67. Filed December 19, 1968.

*J. Everett Blum*, for the petitioners.
*Merritt S. Yoelin*, for the respondent.

TIETJENS, *Judge:* The Commissioner determined deficiencies in income tax in these consolidated cases as follows:

| Docket No. | Taxable year | Deficiency |
|---|---|---|
| 3169-67 | 1962 | $1, 518. 80 |
| | 1963 | 76, 044. 20 |
| | 1964 | 54, 564. 41 |
| 3170-67 | 1963 | 173, 340. 97 |
| | 1964 | 128, 756. 53 |

The parties have stipulated they are in agreement with respect to all issues raised in the notice of deficiencies in both dockets, except the issues concerning the depreciation of cattle owned by Circle Bar Cattle Co., a partnership of which petitioners Harry H. Kem, Jr., and Charles E. Miller were partners.

The only question presented to us is whether a herd of 9,600 breeding cattle can be the subject of a depreciation allowance by the owner-lessor during the term of the specific lease involved in this case.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation and the exhibits attached thereto are incorporated herein by this reference.

Petitioners Harry H. Kem, Jr. (hereinafter referred to as Kem), and Diane C. Kem, husband and wife, filed joint income tax returns for the taxable years 1962, 1963, and 1964 with the district director of internal revenue for the district of Oregon. At the time their petition was filed, Kem resided at Terrebonne, Oreg., while his wife resided in Portland, Oreg.

Petitioners Charles E. Miller (hereinafter referred to as Miller) and Mary J. Miller, husband and wife, filed joint income tax returns for 1963 and 1964 with the district director of internal revenue for the district of Washington. At the time their petition was filed they were legal residents of Vancouver, Wash.

Circle Bar Cattle Co. (hereinafter referred to as Circle Bar) was organized on January 1, 1963, as a partnership. The partners were Kem, Miller, and J. Everett Blum. Circle Bar filed partnership information returns with the district director of internal revenue for the district of Oregon for the 1963 and 1964 taxable years.

On January 2, 1963, Circle Bar entered into an option agreement to acquire 8,450 head of cows from a group of persons who will hereinafter be referred to as the Hudspeth group. Circle Bar exercised its option January 2, 1963, and purchased the 8,450 head of cows at $200 per head for a total of $1,690,000. The bill of sale identified the herd as consisting of "mixed ages, Herefords, Angus and cross bred, selected and approved by [Circle Bar]." The average age of these cows was 6 years and older. Sometime during the period of January 1, 1963, and January 14, 1963, Kem purchased 1,150 2-year-old heifers from the Hudspeth group for $212,585.42. Immediately thereafter Kem transferred the 1,150 heifers to Circle Bar with Circle Bar assuming liability on Kem's financing of this purchase.

On January 14, 1963, Circle Bar leased back the 8,450 cows and 1,150 heifers to the Hudspeth group. The primary term of the lease was to run from January 14, 1963, to January 14, 1966, subject to the lessors' options to extend the lease for two terms of 1 year each. The lessee was to pay Circle Bar $40 rent per head per year and was to pay all personal property taxes on the herd for the full term of the agreement, including any extensions thereof. All calves produced by the herd were to belong to the lessee.

The lease contained the following provisions:

5. Care and Maintenance of Cattle.

(a) Lessees shall keep and maintain said cattle in good and husbandry-like manner and in marketable condition; shall, at their own cost and expense, provide sufficient feed for the proper maintenance and growth thereof; shall pay all bills and statements for feed, veterinary services, supplies, and shall pay all wages and the costs of all other supplies, labor and materials used or performed in connection with the keeping and maintenance of said cattle when the same become due and before the same become delinquent.

\*        \*        •        \*        \*        \*        \*

(c) Lessees will provide not less than six (6) purebred bulls per one hundred (100) head of cows to maintain quality of the herd and to produce good and marketable calves.

(d) Lessees shall, at all times and at their own expense, maintain the herd at 9,600 sound cows of no less quality than leased to them pursuant hereto.

6. Culling of Cattle

(a) Lessees will cull not less than ten per cent of the cattle from the herd during each year at such time and from time to time as may be required to maintain the herd in first class condition. All cows which are diseased or are otherwise undesirable shall be culled, with the balance of the cull to be composed of the older cows in the herd. Lessees shall replace the culled cows, at their expense, as they are culled with two-year old bred heifers which have been pregnancy tested and determined to be with calf.

(b) Culled cattle shall be segregated, but shall not be removed from the leased premises until approved by Lessor, or its agent or representative; and replacement cows shall be kept segregated, and shall not be added to the herd until approved by Lessor, or its agent or representative.

(c) All replacement cows shall become the property of the Lessor, shall be accompanied by appropriate bill of sale warranting them free of all encumbrance * * *. The culled cattle, upon replacement, shall become the property of Lessees and shall be transferred by appropriate bill of sale free of encumbrances except personal property taxes and such liens as shall have been created or allowed by Lessees.

During the primary term of the lease, some of the cattle subject to the lease were sold out of the lease by Circle Bar to the Hudspeth group:

| Number sold | Date sold | Total sales price | Price per head |
|---|---|---|---|
| 715 | Various during 1964 | $138,400 | $193.57 |
| 406 | 3/16/65 | 81,200 | 200.00 |
| 14 | Various during 1965 | 2,800 | 200.00 |
| 2,800 | 8/13/65 | 532,000 | 190.00 |

At the end of the primary term, 800 of the leased cows were found missing. Given the choice of replacing the missing cows or purchasing them for $200 per head, the Hudspeth group decided to purchase them.

On September 13, 1966, Circle Bar and the Hudspeth group entered into an agreement to extend the lease of the 4,865 head of cattle remaining after sales and lost cattle were taken into consideration. The period of the lease extension agreement was from January 14, 1966, to October 15, 1966. The agreement gave the Hudspeth group an option to purchase the entire herd of 4,865 head of cattle for $200 per head. If this option was not exercised by October 1, 1966, Circle Bar had the right to take possession of 1,500 head. The remaining 3,365 head was subject to another option granted to the Hudspeth group for $200 per head. Neither option was exercised.

After the lease extension agreement expired on October 15, 1966, 4,000 of the 4,865 head of cattle were sold as a breeding herd for $200 per head. The disposition of the remaining 865 cows, if disposed of, has not been shown to us.

In 1963 the fair market price of comparable range cows in central Oregon was around $200 per head. That price has remained fairly constant during the period from 1963 through the first 3 months of 1968.

In its 1963 partnership return, Circle Bar placed a 5-year useful life on the leased herd, and elected to compute depreciation by utilizing a 125-percent declining-balance method. Pursuant to this method, Circle Bar claimed $475,646 as a depreciation deduction in its 1963 partnership return, arrived at as follows:

| Item | Cost | Life | Method | Effective rate | Depreciation |
|---|---|---|---|---|---|
| 8,450 cows | $1,690,000 | 5 yrs. or 20% | 125% | 25% | $422,500 |
| 1,150 heifers | 212,586 | 5 yrs. or 20% | 125% | 25% | 53,146 |
| Total | | | | | 475,646 |

In its 1964 partnership return, Circle Bar continued to claim depreciation on the entire herd on a 5-year useful life under the 125-percent declining-balance method. Pursuant to this method, Circle Bar claimed $329,923 as a depreciation deduction in its 1964 partnership return, arrived at as follows:

| Item | Cost | Prior depreciation | Remaining depreciable basis | Effective rate | Depreciation |
|------|------|------|------|------|------|
| 7,735 cows [1] | $1,547,000 | $386,750 | $1,160,350 | 25% | $290,063 |
| 1,150 Heifers | 212,586 | 53,146 | 159,440 | 25% | 39,860 |
| Total | | | | | 329,923 |

[1] Depreciation not computed on 715 cows sold outside the lease by Circle Bar during 1964.

The Commissioner disallowed the claimed depreciation deductions in their full amount for both 1963 and 1964 with the explanation that petitioners had failed to establish they were entitled to such deductions.

OPINION

While Kem and Miller are the petitioners herein, the deficiencies determined in their taxes are based upon their distributive shares of the partnership income of Circle Bar. Accordingly, we must decide whether Circle Bar may deduct depreciation on the 9,600 head of cattle during the term of the lease.

In determining the taxable income of a partnership, all operating costs and expenses allowable as deductions, including a reasonable allowance for the exhaustion, wear, and tear of property used in the business,[1] must be determined and deducted from the gross income. See sec. 703, I.R.C. 1954.

At the risk of being elementary, we restate the principles which underlie the allowance of depreciation. The factors of wear and tear and decay cause physical exhaustion, or depreciation of property used in a business. Ultimately, the operation of these factors results in retirement of property from its intended use in the business. The allowance of depreciation is intended to allow a taxpayer to recover the cost of such property over the period of its use, so as to match the expense due to its exhaustion with the income that it produces. The period over which property may be expected to be used in the business of the taxpayer before its retirement is referred to as its useful life. The proper allowance for depreciation is the amount that would be set aside for the taxable year in accordance with a reasonably consistent

---

[1] SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

  (1) of property used in the trade or business, or
  (2) of property held for the production of income.

plan (not necessarily at a uniform rate) whereby the aggregate of the amounts so set aside in each taxable year of the property's useful life, plus the salvage value (i.e., the estimated fair market value of the property at the end of its useful life in the taxpayer's business), equal the cost or other basis of the property. In no instance may the total amount allowed as depreciation exceed the difference between the cost or other allowable basis and the salvage value which reasonably may be expected to remain at the end of the useful life of the property in the trade or business of the taxpayer. The property subject to claimed depreciation in this case is a leased herd of breeding cattle.

The parties agree that it makes no difference for the purpose of the depreciation allowance that an owner of business property is in the business of leasing it rather than using the property himself. Nor does the Commissioner dispute that a lessor may, upon proper showing, be entitled to some allowance for depreciation (including any obsolescence) of leased depreciable property in a taxable year or years during the term of a lease, even though the lessee has agreed to so preserve, replace, renew, and maintain such property that, at the termination of the lease, the property shall be in at least as good condition as at its beginning. *Terminal Railroad Association of St. Louis*, 33 B.T.A. 906 (1936); *Alaska Realty Co.* v. *Commissioner*, 141 F. 2d 675 (C.A. 6, 1944); *North Carolina Midland Railway Co.* v. *United States*, 143 Ct. Cl. 30, 163 F. Supp. 610 (1958).

The Commissioner has disallowed the claimed depreciation deductions in this case because of his determination that the lessee's obligations with respect to the maintenance of the herd would restore to Circle Bar all of the loss due to the depreciation of the herd during the term of the lease. If that is the case, Circle Bar would not be entitled to any depreciation deduction during the term of the lease. *Terre Haute, Indianapolis & Eastern Trac. Co.*, 24 B.T.A. 197 (1931), reversed on other grounds 67 F. 2d 697 (C.A. 7, 1933); *A. Wilhelm Co.*, 6 B.T.A. 1 (1927).

Congress intended the depreciation allowance to operate as a means for a taxpayer, as an expense of his business, to recoup the loss due to depreciation of business property. It follows that if no loss is suffered, no allowance for depreciation is reasonable. As the Supreme Court recently stated in *Massey Motors, Inc.* v. *United States*, 364 U.S. 92, 101 (1960) : "Congress intended by the depreciation allowance not to make taxpayers a profit thereby, but merely to protect them from a loss."

The factual question whether Circle Bar suffered any loss due to depreciation depends upon our construction of the lease provisions, and our findings as to the practical operation of those provisions.

At the outset we state that we see actual physical deterioration of the herd as the only basis for a depreciation allowance in this case.

Obsolescence, a possible and frequently claimed basis for the depreciation allowance, may be defined as the process of becoming obsolete due to progress of the arts and sciences, changed economic conditions, legislation or otherwise, which ultimately results in the retirement or other disposition of business property. We do not find, nor have petitioners argued or offered any evidence to support a finding, that obsolescence could reasonably be expected or does occur in a cattle herd. Aging of the herd during the lease is an aspect of physical deterioration; it is *not* obsolescence.

The only causes of physical deterioration of a cattle herd that we have been made aware of are aging of the herd and the occurrence in the herd of disease of infertility.

With respect to aged, diseased, or infertile cows, the lease provides:

Lessees will cull not less than ten per cent of the cattle from the herd during each year at such time and from time to time as may be required to maintain the herd in first class condition. All cows which are diseased or are otherwise undesirable shall be culled, with the balance of the cull to be composed of the older cows in the herd. Lessees shall replace the culled cows, at their expense, as they are culled with two-year-old bred heifers which have been pregnancy tested and determined to be with calf.

The lessees were required to cull "not less than ten per cent" of the herd during each year. We emphasize that 10 percent was a floor and not a ceiling to the contracted for culling requirements of the lease. Since all diseased and "otherwise undesirable" cows (including infertile cows since an infertile cow is an undesirable cow in a breeding herd and the normal practice is to cull such cows) were required to be culled from Circle Bar's herd, and replaced by 2-year-old bred heifers, we do not see how Circle Bar could possibly suffer any loss due to the occurrence of either of these infirmities during the term of the lease.

Nor do we understand how it is possible that Circle Bar could suffer any loss due to the herd's advancing in age. As cows become old they become infertile, are stricken with disease, or die. All such old cows were required to be culled from Circle Bar's herd and replaced (at the expense of the Hudspeth group) with 2-year-old heifers bred and determined to be fertile. The age composition of Circle Bar's original herd was: 8,450 head that were of an average age of 6 years and older, and 1,150 2-year-old heifers. The useful life of an individual cow terminated at the age of 7 to 8 years. It is easily seen that a very substantial number of the 8,450 cows that were 6 years and older were expected to be culled at the end of the first year of the lease. They would be replaced with 2-year-olds. The same is true of the second year. At the end of the third year the average age of the entire herd would be less than the average age of the original herd. In other words, we think the herd, initially anyway, would become younger as a result of the

injection of younger cows. We think the culling provision was intended to insure the return to Circle Bar at lease termination of a herd of comparable age and quality, in all respects, to the original herd of 9,600 head. There is strong evidence that the lease provision had the practical effect the parties to it intended.

The petitioners have failed to prove that any allowance for depreciation is reasonable. Accordingly, we uphold the Commissioner's determination that they are not entitled to the claimed deductions.

Because we hold that Circle Bar did not suffer any loss due to depreciation, we do not make any findings with respect to the Commissioner's alternative arguments as to the computation of useful life of the herd in Circle Bar's business of leasing cattle or as to the computation of salvage value on the facts before us.

*Decisions will be entered under Rule 50.*