**Harry H. KEM, Jr., and Diane C. Kem,
Charles E. Miller and Mary J. Miller,
Petitioners-Appellants,**

**v.**

**COMMISSIONER OF INTERNAL
REVENUE, Respondent-Appellee.**

**No. 24151.**

United States Court of Appeals,
Ninth Circuit.

Sept. 11, 1970.

Rehearing Denied Dec. 10, 1970.

Walter H. Pendergrass (argued), Bullivant, Wright, Johnson, Pendergrass & Hoffman, Portland, Or., for petitioners-appellants.

Issie L. Jenkins (argued), Meyer Rothwacks, Wm. A. Friedlander, Attys., Johnnie M. Walters, Asst. Atty. Gen., Tax Division, Dept. of Justice, Richard M. Hahn, Acting Chief Counsel, I. R. S., Washington, D. C., for respondent-appellee.

Before DUNIWAY, WRIGHT and TRASK, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

At issue in this case is whether a depreciation deduction is available to an owner of breeding cattle who leases them to another under conditions so strict as to protect the lessor against any real economic loss. We hold it is not and affirm the ruling of the Tax Court.

Cattle breeding, the business involved here, presents a classical example of how to derive income from capital within the meaning of Eisner v. Macomber, 252 U. S. 189, 40 S.Ct. 189, 64 L.Ed. 521 (1920). The breeder's capital is his herd, and the annual calf crop his income. According to the record, a healthy cow begins to breed at around age two, and produces one calf a year until her breeding life ends at age seven or eight whereupon she is sold to a slaughterhouse. New heifers to replaced aged or diseased animals are either purchased from other ranchers, or diverted from the calves that would normally be sold for cash.

The variant engaged in by the taxpayers consisted of leasing the breeding herd rather than managing it themselves. In January of 1963, their partnership, the Circle Bar Ranch, leased a breeding herd of about 9,600 head to the group of persons from whom Circle Bar had purchased the cattle only a few days earlier at a price of $200 per head.

The lease was for a three-year term, with two one-year renewal options given to the lessor. It provided an annual rental fee of $40 per cow, and included comprehensive provisions requiring the lessees to cull all diseased or otherwise "undesirable" cattle, to replace the culled cows at their own expense with two-year-old bred heifers, and generally to maintain a herd of the same quality as the one leased to them. The cull was in no event to consist of less than ten percent of the herd. The culled cows were to belong to the lessees, but the replacement ones became the property of the lessors. The crucial provisions of the lease are set out in the margin.[1]

---

1. "5. Care and Maintenance of Cattle.
"(a) Lessees shall keep and maintain said cattle in good and husbandry-like manner and in marketable condition; shall, at their own cost and expense, provide sufficient feed for the proper maintenance and growth thereof; shall pay all bills and statements for feed, veterinary services, supplies, and shall pay all wages and the costs of all other supplies, labor and materials used or performed in connection with the keeping and maintenance of said cattle when the same become due and before the same become due and before the same become delinquent.
"(c) Lessees will provide not less than six (6) purebred bulls per one hundred (100) head of cows to maintain quality of the herd and to produce good and marketable calves.
"(d) Lessees shall, at all times and at their own expense, maintain the herd at 9,600 sound cows of no less quality than leased to them pursuant hereto.
"6. Culling of Cattle.
"(a) Lessees will cull not less than ten per cent of the cattle from the herd during each year at such time and from time to time as may be required to maintain the herd in first class condition. All cows which are diseased or are otherwise undesirable shall be culled, with the balance of the cull to be composed of the older cows in the herd. Lessees shall replace the culled cows, at their expense, as they are culled with two-year old bred heifers which have been pregnancy tested and determined to be with calf.
"(b) Culled cattle shall be segregated, but shall not be removed from the leased premises until approved by Lessor, or its agent or representative; and replacement cows shall be kept segregated, and shall not be added to the herd until

A number of cattle were sold out of the lease, but about half the herd—subject to culls and replacements—remained together for the three-year term of the lease and the nine month extension which, by a later agreement, followed. They were then sold in October, 1966, as a breeding herd for $200 per head. The fair market price of comparable range cows in central Oregon remained fairly constant at $200 per head throughout this period.

Circle Bar's partnership returns in 1963 and 1964 claimed a depreciation deduction on the cows subject to the lease, using the declining balance method and placing a five-year useful life on the cattle. Salvage value, though not immediately crucial in view of the election to use the declining balance method, was claimed to be $46.20, the going price for older cows in the canners' and cutters' market in Portland, Oregon. The Commission, taking the position that no depreciation was reasonable under the circumstances, disallowed the deduction, and assessed a deficiency against the partners' tax. The Tax Court upheld the Commissioner, 51 T.C. 455 (1968), and the taxpayers brought the case here. 26 U.S.C. § 7482.

■ The Tax Court found, and we cannot say the finding is clearly erroneous, that the provisions of the lease would if carried out have restored to the taxpayers any possible loss resulting from the physical deterioration or aging of the herd. All diseased or "undesirable" cows (including barren ones, since a barren cow is undesirable in a breeding herd) were required to be culled and replaced with bred two-year old heifers. Given the age composition of the original herd, and the taxpayers' own estimate that the useful life of a breeding cow terminated at seven or eight years, the effect of the cull-and-replace requirement of the lease was to ensure that, at the end of the five-year (maximum) term of the lease, the lessors would receive back a herd of the same or better quality and age composition as the one they had leased.[2]

■ It is of course elementary that the purpose of the depreciation deduction is to protect the taxpayer against loss, not to give him a profit. Massey Motors v. United States, 364 U.S. 92, 101, 80 S.Ct. 1411, 4 L.Ed.2d 1592 (1960). It follows, as the Tax Court properly said, that if no loss is suffered, no allowance for depreciation is reasonable. 51 T.C. at 460.

Where leases of property are concerned, we think the proper rule was laid down nearly 40 years ago in Commissioner of Internal Revenue v. Terre Haute Electric Co., 67 F.2d 697 (7th Cir. 1933). In that case the taxpayer had leased all its property to a third party under a lease requiring the lessee to "renew, repair, and replace the same, so as to keep the demised premises in as good order, repair and condition as the same are now and in their present state of efficiency." The property was to be appraised at the beginning and end of the lease period and the lessee was required to make good to the lessor any diminution in value. The court held that under such circumstances no deduction for de-

---

approved by Lessor, or its agent or representative.

"(c) All replacement cows shall become the property of the Lessor, shall be accompanied by appropriate bill of sale warranting them free of all encumbrance * * *. The culled cattle, upon replacement, shall become the property of Lessees and shall be transferred by appropriate bill of sale free of encumbrances except personal property taxes and such liens as shall have been created or allowed by Lessees."

2. The herd consisted, as the Tax Court found, of 8,450 cattle with an average age of six years, and 1,150 head of two-year old heifers. Within three years, the great majority of the 8,450 head can have been expected to pass age seven or eight and come to the end of their useful life as breeding cattle. The lessee, under the terms of the lease, would have been obliged to replace all these older cows with two-year olds. After five years, therefore, the average age of the herd would have been considerably younger than at the beginning of the lease.

preciation was available to the taxpayer-lessor, since it had "failed to show a present loss." 67 F.2d at 698. *See also* A. Wilhelm Co., 6 B.T.A. 1 (1927).

We are not persuaded by the taxpayers' argument that the *Terre Haute* doctrine is limited to situations where the lease contains an express covenant by the lessee to restore the full value of the property originally leased. Several cases have relied on *Terre Haute* to deny depreciation to lessors even in the absence of a full value restoration clause from the lease. Atlantic Coast Line R.R. v. Commissioner of Internal Revenue, 81 F.2d 309 (4th Cir. 1936); Georgia Ry. & Electric Co. v. Commissioner of Internal Revenue, 77 F.2d 897 (5th Cir. 1935); Mississippi River & Bonne Terre Ry., 39 B.T.A. 995 (1939); Cincinnati Gas & Electric Co., 36 B.T.A. 1122 (1937). The rule contended for by the taxpayers, moreover, would exalt form over substance by treating differently those whose leases give them full protection against loss, simply because in one case the protection is stated explicitly, while in the other it follows necessarily from the subsidiary terms of the lease.

The taxpayers also rely on a number of cases which they say have limited or rejected the *Terre Haute* rule. North Carolina Midland Ry. v. United States, 163 F.Supp. 610, 143 Ct.Cl. 30 (1958); Alaska Realty Co. v. Commissioner of Internal Revenue, 141 F.2d 675 (6th Cir. 1944); St. Paul Union Depot Co. v. Commissioner of Internal Revenue, 123 F.2d 235 (8th Cir. 1941); Helvering v. Terminal R. R. Ass'n, 89 F.2d 739 (8th Cir. 1937); Terminal Realty Co., 32 B.T.A. 623 (1935).[3] Examination of the cited cases, however, discloses that they are not in point here.

In each, the lessee was required to keep the leased property in good repair, but not to renew or replace it at the termination of its useful life. The courts held that under the circumstances of the cases the lessor faced a very real possibility of loss from the increasing age or obsolescence of the leased property. Since under the terms of the lease the lessee's obligation included only repairs, the loss to the lessor from obsolescence would not be restored to him by the lessee. A deduction for depreciation was therefore held to be proper.

In the case at bar, in contrast, there is no possibility of a loss to the taxpayers through increasing age or obsolescence of their herd. To be sure, individual cows age and die. But under the terms of the lease the lessees are obligated to cull the older cows and replace them with young ones so as to preserve a herd of the same age composition as the one leased. Hence whatever its consequences to the cows natural aging can result in no loss to their owners.

Nor do we think that cases like Lamson Bldg. Co. v. Commissioner of Internal Revenue, 141 F.2d 408 (6th Cir. 1944) and Zelco, Inc. v. Commissioner of Internal Revenue, 331 F.2d 418 (1st Cir. 1964) support the taxpayers' position here. Without considering whether those cases were rightly decided, *see* Commissioner of Internal Revenue v. Moore, 207 F.2d 265 (9th Cir. 1953); *but cf.* World Publishing Co. v. Commissioner of Internal Revenue, 299 F.2d 614 (8th Cir. 1962), it is sufficient that they involved situations where the value of the leased property was properly anticipated to be less at the end of the term than at the beginning. The taxpayer's right to *some* allowance for depreciation was therefore both obvious and admitted by the Commissioner, and the only question was whether he was obliged to spread his deduction over the entire lease

---

3. *See also* Gulf, M. & N. R. R. v. Commissioner of Internal Revenue, 83 F.2d 788 (5th Cir. 1936); Charles B. Currier, 7 T.C. 980 (1946); Richmond Belt R. R., 13 B.T.A. 1291 (1928).

period, or could concentrate it during the (shorter) useful life of the property. The cases are no authority for a depreciation deduction when, as here, there is no reasonably anticipated loss to the taxpayer.

Appellants urge finally that the Tax Court erred in regarding the herd, rather than the individual cows, as the depreciable item, pointing out correctly that an owner-operator would have been entitled to depreciate individual cows, even though he continually made replacements so as to maintain a herd of constant quality. Since the only effect of the lease arrangement involved here was to shift to the lessees the replacement burden the owners would otherwise have borne, and since replacement values are normally irrelevant to depreciation, they contend contractual shifting of the duty to replace aging cattle should not affect the owners' right to depreciation of those that remain.

The argument overlooks the fact that the lease arrangement here did more than merely shift the burden of replacement to the lessees. It also had the effect of insulating the lessors from any possible loss resulting from the aging or illness of their cattle. The owner-operator is entitled to depreciation because he faces a very real and anticipable loss from the aging of his cattle over time. Unless he makes a sizable investment in replacing older cows with young ones, he will be left at the end of a few years with a herd seriously diminished in value.

But the taxpayer here had no real and no anticipable loss from the aging of the cattle. If the lessee complied with the terms of the lease, the taxpayer would receive back a herd of as good or better quality as the one leased. Only if the lessee breached the conditions of the lease could the taxpayer suffer a loss. And, if anything is settled in tax law, it is that the depreciation deduction is not available as insurance against a breach of contract.

Affirmed.