**WATSON LAND COMPANY,**
**Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 84–7021.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 9, 1986.

Decided Sept. 12, 1986.

Jack R. White, Los Angeles, Cal., for petitioner-appellant.

Michael Paup, Michael J. Roach, Washington, D.C., for respondent-appellee.

Before ANDERSON, POOLE and THOMPSON, Circuit Judges.

THOMPSON, Circuit Judge:

Appellant Watson Land Company ("Watson") appeals from the tax court's determination that federal income tax deficiencies are due from it for taxable years 1973, 1974 and 1975 as a result of an overstatement of its depreciation deductions during those years.

In 1970, Watson began depreciating a number of its industrial buildings by using the composite method of depreciation. This method required not only a determination of the useful lives of the buildings' shells and certain structural parts of the buildings (collectively "the building shells"), but a determination of the useful lives of the buildings various component parts as well. Watson made its determination of the useful life figures for the building shells and for the components and calculated the composite life of its concrete tilt-up buildings to be 30 years. Using that composite life figure, it depreciated the buildings at the rate of 3⅓ per year.

The Commissioner of Internal Revenue ("the Commissioner"), disagreed with Watson's 30-year composite life figure and disallowed a portion of Watson's depreciation deductions for taxable years 1973, 1974 and 1975. Watson was notified of tax deficiencies and filed a petition in the United States Tax Court for a redetermination of the deficiencies. The tax court concluded that the useful lives of Watson's building shells consisting of concrete tilt-up type construction were 60 years, and the minimum useful lives of the components were 25 years. Using the "weighted average" method to compute composite life, the tax court calculated the composite life of Watson's concrete tilt-up buildings to be 47.75 years. On that basis, Watson's tax deficiencies were determined to be $82,115 for 1973, $169,255 for 1974, and $186,972 for 1975.

We reverse and remand to the tax court for redetermination of Watson's tax deficiencies, as we conclude that the correct composite life for Watson's concrete tilt-up type buildings is 39.84 years.

## I

### FACTS AND PROCEEDINGS

Watson, a California corporation, was incorporated in 1927 for the purpose of engaging in the real estate business. Prior to 1960, Watson used its real estate holdings as farmland and occasionally sold parcels for industrial or residential use. In the early 1960's, Watson decided to develop its remaining land for industrial use. Watson began doing business as Watson Industrial Properties. Its primary activity became the development of Watson Industrial Center ("WIC") in the City of Carson, California. Watson describes itself as a land developer whose purpose is to use land to its highest valued use.

Watson designed WIC as a large, master-planned industrial park. Virtually all of the buildings in WIC are large single-story structures with concrete tilt-up walls, glue-lam beam roofs, and concrete floors. The buildings average 125,000 square feet in size, with office space accounting for approximately three percent of the total area. Building coverage is approximately forty-

five to fifty percent of the developed land area.

WIC is zoned M–4. This zoning classification generally permits light, medium and heavy industrial uses, including uses sometimes referred to as "obnoxious to neighbors." Lands predominantly used for industrial purposes border WIC on three sides. The city of Carson, where WIC is located, is responsive to industrial requirements. Over fifty-three percent of the city is devoted to industrial development.

Watson leases most of its buildings on a "triple net basis" to industrial tenants who conduct manufacturing and warehousing activities. The lessees are required to pay property taxes, premiums on insurance on the leased property, and all costs of repairs and maintenance. As of January 1, 1975, the original lease terms ranged from a low of 5 years to a high of 20 years. The average lease period was approximately 18 years. The leases are standard form leases which do not differ in any material respect. Lessees uniformly are required to maintain their premises in proper and efficient operating order, to make all repairs, and to replace any damaged portions of the buildings at their own expense. The leases do not require Watson to maintain or to make any repairs or replacements.

Watson hired the American Appraisal Company ("American") to prepare appraisal reports for its first seven buildings and a building addition (collectively "the first seven buildings") as the buildings were built. These reports were prepared to identify each of the functional building components and their costs, and to estimate the normal economic useful life expectancy of each building component. The appraisal reports separated each of the building premises into five general categories: (1) land improvements; (2) building structure; (3) roof cover and interior and exterior finishes; (4) building service systems and equipment; (5) special facilities and equipment required by the tenant's particular use of the building. Each general category was then broken down into a number of component parts. The seven appraised buildings averaged a breakdown into about 62 component parts.

For the first seven buildings for which appraisal reports were prepared, Watson used and still uses the *component* method of depreciation. Watson used the information provided by American to allocate the total cost of construction of each building among its various component parts and to determine the useful life of each component. From these figures, Watson calculated a straight line depreciation deduction for each component.

Beginning in 1970, Watson began to use the *composite* method of depreciation for each new building it built. In computing its composite rate of depreciation for these new buildings, Watson relied on American's appraisal of those buildings among the first seven built which were of concrete tilt-up type construction. All of the new buildings were virtually of that same type construction. Watson calculated a composite life for all of its post–1969 "new" buildings by totaling the amount of annual straight-line depreciation for all of the components of its buildings of concrete tilt-up type construction which American had appraised among the first seven built, and dividing this total into the total depreciable cost of the buildings. The result was a composite or average life of less than 28 years. Watson rounded this figure to 30 years. It then applied a composite depreciation rate of 3⅓ per year to each of its buildings of concrete tilt-up type construction built after 1969.

Watson claimed depreciation deductions for the taxable years ending 1973, 1974 and 1975 of $818,660, $1,195,627 and $1,351,556, respectively, using both the component, straight-line method of depreciation for its first seven buildings, and using the composite method of depreciation for most of its other buildings. The composite method of depreciation was based upon Watson's 30–year composite life computation.

The Commissioner disallowed depreciation deductions totalling $406,211, $578,228 and $642,079 for 1973, 1974 and 1975, re-

spectively, and calculated deficiencies in Watson's income taxes for those years of $231,956, $276,120 and $298,787. The Commissioner contended Watson had understated the useful lives of the various building components, and that understatement contributed to the understatement by Watson of the composite life of the buildings. The tax court agreed, and ultimately determined Watson's tax deficiencies for 1973, 1974 and 1975 to be $82,115, $169,355 and $186,972, respectively.

Watson disputes the tax court's determination that (1) its building components have minimum useful lives of 25 years; (2) its building shells and related components have useful lives of 60 years; and (3) its concrete tilt-up buildings have composite useful lives of 47.75 years.

## II

## ANALYSIS

A. *Minimum Useful Lives of Components and Lease Terms*

Watson presented expert testimony that the normal useful lives of the building components (other than land improvements) ranged from 10 years to 20 years. This testimony was not controverted. The Commissioner's expert reviewed the repair and replacement provisions of Watson's leases.[1]

He determined the average length of the various leases was approximately 20 years, and with renewal options was "just over 25 years." He testified, "[i]f the tenants are making all repairs, renewals and replacements during this period, it would follow that the minimum useful life of any component would be 20–25 years." He testified further: "I'd say the depreciation period was 20 years, *plus* however long [a building component] was going to last once [Watson] got it back." (emphasis added). Watson did not offer any evidence to rebut this testimony. Watson maintained that provisions of the leases had nothing to do with the useful lives of the components.

The tax court found that the average period of the Watson leases was 18 years, exclusive of the renewal options. The court determined that in view of the repair and replacement provisions of the leases, and based upon the testimony of the Commissioner's expert witness and the Commissioner's determination of the useful lives of the components, the minimum useful lives of the building components (other than leasehold improvements) was 25 years.

Watson contends that Treasury Regulation § 1.167(a)–4 precludes any reference to the provisions of the leases in determining the useful lives of the components of the buildings.[2] Watson argues that *Zelco, Inc.*

1. The repair and replacement provisions of Watson's standard lease agreements provided in relevant part:

Lessee, at its sole cost and expense, shall maintain the entire demised premises in a clean and orderly condition and appearance, state of repair, and operating order.... Without limiting the generality of the foregoing, Lessee shall perform all maintenance detailed in paragraphs I (exterior repainting), J (resurfacing paved areas), and K (mechanical service controls).... Lessee shall promptly make all necessary repairs and perform such other required maintenance, interior or exterior, ordinary as well as extraordinary, as may be required to maintain the demised premises in such clean and orderly condition.... Lessor shall not be obligated to maintain nor to make any repairs, replacements, or renewals of any kind, nature or description whatsoever to the demised premises or any buildings or improvements thereon.... In the event the buildings or other structures on the demised premises are damaged or de-

stroyed, then Lessee shall repair and restore such improvements then owned by Lessor to their condition prior to said damage or destruction.... Upon any termination of this Lease ... Lessee shall surrender immediately possession of the demised premises and all buildings and improvements on the same premises to Lessor in a clean and orderly condition and appearance, state of repair and operating order.... Upon termination of this Lease Lessee shall surrender the demised premises in a "broom-clean" condition, with all electrical, plumbing and mechanical installations in a good, safe and fully operable condition.... If directed so to do by Lessor, Lessee shall also remove any improvements.... made to the demised premises by Lessee and thereafter restore the demised premises to their original condition....

2. Treasury Regulation Section 1.167(a)–4 provides in relevant part:

Capital expenditures made by a lessor for the erection of buildings or other improvements

*v. Commissioner*, 331 F.2d 418 (1st Cir. 1964) supports this contention. In *Zelco* the lessor (taxpayer) leased trailers and tractors to an interstate motor carrier. Each trailer and tractor came equipped with new tires. The average useful life of a new tire was twelve months. The useful lives of the trailers and tractors were five and six years, respectively. The leases were for initial one-year periods; however, each lease gave the lessee three successive one-year renewal options. The maximum term of the leases, therefore, was four years. *Id.* at 418. The lessees agreed to "maintain the leased equipment in good operating condition and repair and [to] *furnish all such tires, tubes, accessories and parts as may be required....*" *Id.* at 419. (emphasis in original). The lessor depreciated the cost of the new tires ratably over twelve months. The Commissioner contended the lessor should have depreciated the tires over the four-year maximum period of the leases. The tax court agreed, but the First Circuit reversed stating:

> It is the useful life of the leased property rather than the *duration of the lease* that should be the determining factor in computing depreciation of the property. *Lansom [Lamson] Bldg. Co. v. Commissioner of Internal Revenue*, 141 F.2d 408 (6th Cir.1944). *See* Treas.Reg. § 1.167(a)–4 (last sentence). In addition, a lessor may receive a depreciation deduction over the property's useful life although the lessee is charged with the repair, replacement and maintenance of that property. *Alaska Realty Co. v. Commissioner of Internal Revenue*, 141 F.2d 675 (6th Cir.1944).

*Zelco*, 331 F.2d at 420–21 (emphasis added and footnotes omitted).

The First Circuit in *Zelco* pointed out that the tires would be:

" ... fully worn out within twelve months from the inception of the lease. The lessee was then obliged to 'furnish all such tires, tubes, accessories and

parts as may be required' for the successive terms for which the lease was to be extended. The vehicles would then be returned to petitioner with tires having only a nominal or salvage value."

*Id.* at 420. There was no question in *Zelco* that the tires would be virtually worthless at the end of the lease. New tires which would last twelve months were on the vehicles at the inception of the lease and those tires would be worn out during the first year. The vehicles with their worn-out tires would then either be returned to the lessor and the lease would terminate, or the lease would be renewed for another year and new tires would be put on the vehicles, only to be worn out over the next twelve months and then either returned to the lessor or replaced for the next renewal period. That would continue on until the lease ended. At the end of the lease the tires would always be worn out. Under these circumstances, the court reasoned it would be unreasonable to require the lessor to wait four years before it could recover the full cost of the tires while the lessee "could have deducted the costs of at least three sets of tires during the four year term of the lease...." *Id.* at 421, n. 3.

In contrast to *Zelco*, *Kem v. Commissioner*, 432 F.2d 961 (9th Cir.1970) involved a lease transaction in which the lessor would suffer no economic loss at the end of the lease. In *Kem* the lessor leased a herd of breeding cattle to a lessee who was required to replace all cattle lost by disease and to compensate for the natural effects of aging by culling older cows and replacing them with younger ones. At the end of the lease the lessor would receive back a herd equal or superior in number, quality, and age to the herd originally leased. This court held that the terms of the lease provided the lessor with complete protection against any economic loss, and therefore, he was not entitled to depreciate the herd. *Id.* at 963; *see also Royal St. Louis, Inc. v.*

---

shall, if subject to depreciation allowances, be recovered by him over the estimated life of the improvements without regard to the *period* of the lease.

Treas.Reg. § 1.167(a)–4 (emphasis added).

*United States,* 578 F.2d 1017 (5th Cir.1978) (following *Kem* analysis); *Commissioner v. Terre Haute Electric Co.,* 67 F.2d 697 (7th Cir.1933).

Watson argues *Zelco* should dictate the result in this case rather than *Kem.* We disagree.

In *Zelco* the leased property would be returned to the lessor at the end of the lease in essentially worthless condition. The lease provisions did not ameliorate this result. In *Kem* the leased property would be returned to the lessor at the end of the lease in the same or better condition than when leased. The lease provisions protected the lessor against any economic loss whatsoever. In the present case, Watson is afforded only partial protection against economic loss. *Kem* teaches, however, that we must look to the terms of a lessor's lease to determine to what extent he is protected from economic loss. Treasury Regulation section 1.167(a)–4 does not preclude this analysis. The plain language of the regulation is that capital expenditures, if subject to depreciation allowances, may be recovered by a lessor over the estimated life of the improvements without regard to the *period* of the lease. Treas.Reg. § 1.167(a)–4 (last sentence). The phrase "without regard to the period of the lease" refers to the length of the lease and not to the provisions of the lease. We conclude, as we did in *Kem,* that the provisions of Watson's lease must be analyzed to determine to what extent Watson is protected against economic loss.

*Alaska Realty Co. v. Commissioner,* 141 F.2d 675 (6th Cir.1944) cited by Watson, is inapposite. In *Alaska Realty Co.* a lessor leased a department store, hotel, garage and warehouse to a lessee for 99 years. The lease contained a provision that the lessee would "keep the property in good repair and . . . replace all or any part thereof whenever necessary." *Id.* at 675. The Commissioner disallowed *all* depreciation deductions taken by the lessor because under the terms of the lease the lessee bore the entire burden of all economic loss from depreciation of the leased assets during the

period of the lease. The Sixth Circuit held that the taxpayer/lessor was entitled to claim depreciation deductions, stating:

> The lessee's obligation to repair and replace all or any part of the premises *whenever necessary* is, surely, not equivalent to agreeing that property of the same value, as originally leased, will be surrendered to the lessor at the termination of the lease. It could not reasonably be supposed that, under the above provision, the lessor could compel the lessee to return to it replaced buildings equal to the value of the properties originally leased. The requirement to replace whenever necessary, does not mean to replace, whenever necessary to save the lessor from loss arising out of exhaustion, wear and tear, and obsolescence, but rather to replace when necessary for the use of the premises in the operation and conduct of the business. The lessor was entitled to a deduction for depreciation, including obsolescence.

*Id.* at 676 (emphasis in original). The Sixth Circuit similarly held that a taxpayer/lessor was entitled to *some* allowance for depreciation in *Lamson Bldg. Co. v. Commissioner,* 141 F.2d 408 (6th Cir.1944). In *Lamson* the lessor depreciated buildings and equipment leased to a lessee for a term of 75 years. The Commissioner contended that the lessor's depreciation should have been spread over the entire 75–year term of the lease, without any regard to the useful life of the leased assets. The Sixth Circuit held that the taxpayer was not required to amortize depreciation over the entire term of the lease, and since there was no dispute (through a stipulation of the parties) as to the useful life of the assets, or their cost basis, the taxpayer/lessor's depreciation deductions were allowed. *Id.* at 410.

■ In the present case, the dispute between Watson and the Commissioner is not over whether depreciation must be spread over the periods of the leases, but rather over what rate of depreciation Watson may use based upon a determination of the useful lives of the components of the build-

ings. Watson saw fit in the presentation of its case in the tax court to stand pat on its evidence of the normal useful lives of the components without giving any consideration as to how the normal useful lives of the components would be affected by the repair and replacement provisions of the leases. The Commissioner's expert witness considered the normal useful lives of the components, but also testified as to the repair and replacement provisions of the leases. He stated: "[I]f the tenants are making all repairs, renewals and replacements during [his computation of an average 20–year term of the leases] it would follow that the minimum useful life of any component would be 20–25 years." He also testified: "I'd say the depreciation period was 20 years, plus however long [a building component] was going to last once [Watson] got it back." This evidence was not rebutted. It consisted of an analysis of the effect of the repair and replacement provisions of the Watson leases. The expert also considered the length of time the tenants would be responsible to make such repairs and replacements.[3] Based upon this uncontroverted evidence, that court determined the minimum useful lives of the building components (other than leasehold improvements) was 25 years.

■■■■ The tax court's determination as to the useful lives of the components is subject to review under the clearly erroneous standard. *Graves v. Commissioner of Internal Revenue*, 400 F.2d 528 (9th Cir. 1968) (per curiam); *see also Kem*, 432 F.2d at 963 (findings of tax court that provisions of lease would protect taxpayer/lessor from any possible loss reviewable under clearly erroneous standard). The tax court's finding that the minimum useful lives of the building components (not including land improvements) was 25 years was not clearly erroneous. Moreover, in arriving at this conclusion the tax court adopted the Commissioner's determination that the minimum useful lives of the com-

ponents was at least 25 years. Such a determination by the Commissioner is presumed correct unless the taxpayer introduces evidence sufficient to support a contrary finding. *Ames v. Commissioner*, 626 F.2d 693, 696 (9th Cir.1980). Watson's evidence of the "normal" useful lives of the components, without giving any consideration to the provisions of the leases, was not sufficient to support a finding contrary to the Commissioner's determination.

### B. *Depreciation of Building Shells*

■■ Internal Revenue Code section 167(a)(1) allows a taxpayer to deduct "a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)" for property used in the taxpayer's trade or business. 26 U.S.C. § 167(a)(1). Section 1.167(a)–1(b) of the Treasury Regulations provides in part:

> For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions, and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements.

Treas.Reg. § 1.167(a)–1(b).

Watson's burden of proof in the tax court was to show "to a reasonable approximation" that it correctly determined the

---

**3.** The period of time a tenant may be willing to obligate himself under maintenance covenants of a lease may or may not be the same as the length of the lease. In the present case the tenants' maintenance covenants and the periods of the leases were the same.

useful lives of its building shells. *Ames*, 626 F.2d at 695; *Western Terminal Co. v. United States*, 412 F.2d 826, 827 (9th Cir. 1969) (per curiam). The Commissioner's determination of useful life is presumed correct, unless the taxpayer introduces evidence sufficient to support a contrary finding. This remains true whether the taxpayer is attempting to prove either a shorter useful life (Watson's case), see Treas. Reg. § 1.167(a)–1(b), or a useful life cut short by obsolescence. See Treas.Reg. § 1.167(a)(9). *Ames*, 626 F.2d at 696.

The Commissioner's expert witness, Eubanks, testified that Watson's type of building has an almost indefinite *physical* useful life, and yet he estimated the *useful* life to be 60 years. Eubanks considered the following factors in his consideration of the impact of obsolescence on the physical useful lives of Watson's buildings: (1) industry guidelines; (2) the location of the buildings; (3) the construction of the buildings; (4) the adaptability of the buildings to different uses; (5) freeway access; (6) the surrounding area (an industrial park); (7) the fact that WIC is bounded on one side by residential property and on three sides by industrial property; (8) the lack of evidence that residential use would encroach on the current industrial use; and (9) the evidence tending to show that industrial use would encroach on residential use.

Watson argues that Eubanks failed to consider how the useful lives of the buildings would be affected by a diminishing rate of return on the value of the underlying land. Watson contends the rate of return on the land and buildings has declined over the years because the highest and best use of the underlying land has changed from an industrial to a commercial use. It contends the building shells are not suitable for use as commercial properties and thus are becoming obsolete and will have to be replaced in order for Watson, a real estate developer, to obtain a reasonable rate of return on the value of the underlying land. Watson's expert witness, Metcalfe, supported this contention. He testified that Watson's concrete tilt-up buildings became uneconomic to build be-

tween 1965 and 1973 due to the fact that rents for this type of structure could not be increased commensurate with a reasonable rate of return on increased land values and construction costs. He stated this disparity caused the rate of return on Watson's type of buildings to fall about 5.5 percent, forcing investors to seek higher incomes available from commercial and office developments. In essence, it is Watson's position that its building shells are becoming economically obsolete and that their useful lives should be shortened accordingly.

After hearing the testimony presented by the expert witnesses of both parties, the tax court concluded that the useful life of the building shells was 60 years. This finding of fact is subject to review under the clearly erroneous standard. *Honodel v. Commissioner*, 722 F.2d 1462, 1471 (9th Cir.1984). We find no clear error in the court's finding. Moreover, "the unprofitability of an asset is insufficient to establish obsolescence." *Ames*, 626 F.2d at 697; *see also Honodel*, 722 F.2d at 1469 (rejecting the use by the taxpayers of the "economic useful life" approach, which defined the useful life of a capital asset "as the period during which the asset would produce an acceptable rate of return ... to the investors.").

### C. Calculation of Composite Useful Lives of Concrete Tilt-Up Buildings Including Land Improvements

■ The tax court's determination that the composite useful life of Watson's concrete tilt-up buildings, including land improvements is 47.75 years, was founded on the court's interpretation of law. Accordingly, we review this conclusion de novo. *Vukasovich, Inc. v. Commissioner*, 790 F.2d 1409, 1413 (9th Cir.1986); *Honodel*, 722 F.2d at 1469.

The tax court concluded:

After [considering] the record as a whole and our foregoing holdings as to the useful lives of various components in [Watson's] concrete tilt-up buildings, we have concluded, and hereby find as facts,

that [Watson's] buildings including land improvements depreciated on the composite method have useful lives of 47.75 years....

In composite depreciation accounting, a number of assets with the same or different useful lives may be combined into one account, and a single rate of depreciation, the composite rate, used for the entire account. Treas.Reg. § 1.167(b)–1(b), example (2). Watson contends it is entitled to calculate the composite useful life of its property as set forth in example (2) of Treasury Regulation section 1.167(b) which provides as follows:

In the case of classified or composite accounts, the classified or composite rate is generally computed by determining the amount of one year's depreciation for each item or each group of similar items, and by dividing the total depreciation thus obtained by the total cost or other basis of the assets. The average rate so obtained is to be used as long as subsequent additions, retirements, or replacements do not substantially alter the relative proportions of different types of assets in the account.

Treas.Reg. § 1.167(b)–1(b), example (2).

The Commissioner argues the composite useful lives of the assets should be calculated by using the "weighted average" method. He contends this is a superior method of accounting for depreciation in this particular case because subsequent additions, retirements, or replacements may substantially alter the relative proportions or "mix" of different types of assets in Watson's account. However, section 1.167(b)–1(b) provides that a taxpayer may generally use the method of calculation set forth in example (2) to calculate the composite useful life of items in a composite account. Treas.Reg. § 1.167(b)–1(b), example (2).

Internal Revenue Code section 167(b) specifically authorizes the Secretary to prescribe regulations for computing the reasonable depreciation allowance permitted under Internal Revenue Code section 167. 26 U.S.C. § 167(b). Regulations issued under specific statutory authorization are legislative regulations. Such legislative regulations, if consistent with statutory authorization, adopted pursuant to proper procedure, and reasonable, have the force of law. *Tamura v. United States,* 734 F.2d 470, 472 (9th Cir.1984); *Dillon Ranch Supply v. United States,* 652 F.2d 873, 880 (9th Cir.1981).

■ The Commissioner has not argued that the method provided in section 1.167(b)–1(b) (the "regulation" method) used by Watson is inconsistent with the statute, adopted improperly or unreasonable. Though deference is usually owed the Commissioner's interpretation of a regulation, this general principle only sets the framework for judicial analysis; it does not displace it. *United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 24, 102 S.Ct. 821, 827, 70 L.Ed.2d 792 (1982); *Bolton v. Commissioner,* 694 F.2d 556, 560 (9th Cir.1982). The Commissioner has failed to supply a reasoned explanation for interpreting Treasury Regulation section 1.167(b)–1(b) to disallow the use of the "regulation" method for calculating the composite useful life of Watson's buildings. Therefore, Watson's use of the "regulation" method was permissible.

By using the "regulation" method to compute composite life, Watson calculates that if the composite useful life figures found by the tax court are used (which figures Watson disputes), its concrete tilt-up buildings including land improvements have a composite useful life of 39.84 years. While the Commissioner contends the "weighted average" method is the appropriate method to use to calculate the composite useful life of items in a composite account, it does not dispute the arithmetic computation made by Watson based upon the "regulation" method of computing composite life using the tax court's findings of "useful lives."

We conclude that 39.84 years is the correct composite life for Watson's concrete tilt-up buildings, including land improvements.

## CONCLUSION

We affirm that portion of the tax court's decision determining the minimum useful lives of Watson's building components (not including land improvements) to be 25 years, and determining the useful lives of its building shells to be 60 years. We reverse that portion of the tax court's judgment in which it determined the composite lives of Watson's concrete tilt-up buildings, including land improvements, to be 47.75 years and conclude that the correct calculation yields a composite life for those assets of 39.84 years.

The tax court's decision determining Watson's federal income tax deficiencies for the taxable years 1973, 1974 and 1975 is reversed. We remand to the tax court to determine Watson's tax deficiencies for those years consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.