HERBERT D. WIENER AND SHIRLEY M. WIENER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

GEORGE M. WIENER AND BARBARA E. WIENER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4756–68, 4757–68. Filed April 17, 1972.

*Harvey R. Friedman* and *Sidney J. Machtinger,* for the petitioners. *Earl Goldhammer* and *Stephen W. Simpson,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined deficiencies in petitioners' Federal income taxes for 1964 and 1965 as follows:

| Petitioners | 1964 | 1965 |
|---|---|---|
| Herbert D. Wiener and Shirley M. Wiener | $40,824 | $19,853 |
| George M. Wiener and Barbara E. Wiener | 42,736 | 13,070 |

Some issues having been stipulated, the sole remaining issue is whether certain outlays of funds by petitioners during 1964 and 1965 constituted costs of raising calves for subsequent inclusion in a dairy herd within the meaning of section 1.162–12, Income Tax Regs.

#### FINDINGS OF FACT

Herbert D. Wiener (hereinafter referred to as Herbert) and Shirley M. Wiener, husband and wife, and George M. Wiener (hereinafter George) and Barbara E. Wiener, husband and wife, were legal residents of Encino, Calif., at the time they filed their petitions. Both

couples filed their respective joint Federal income tax returns for 1964 and 1965 with the district director of internal revenue, Los Angeles, Calif.

Herbert and George (sometimes hereinafter petitioners) are brothers; they have been engaged in the practice of law in California since 1947 and 1944, respectively. In 1949, they, together with George K. Bramet (hereinafter Bramet), a childhood friend of George, purchased some cows for the purpose of developing a beef cattle herd. For a fee, these cattle were cared for at the Los Flores Ranch, owned by Edward C. Chilcott (hereinafter Chilcott), Bramet's employer. Chilcott is also one of George's clients. The herd was sold at a profit in 1953.

From the time they sold their cattle herd until 1963, petitioners neither owned cattle nor had any other financial interest in the cattle business. However, during this period, George became aware of the financial opportunities offered by the dairy business. In 1963, when Herbert and George were about to realize an unusually large amount of income from a business venture, they began to negotiate with Bramet and Chilcott on the possibility of acquiring a dairy herd. At that time, Chilcott owned the River Ranch Co. (hereinafter River Ranch or the Ranch) which was engaged in extensive dairy operations in California, Oregon, and Arizona. One of River Ranch's activities involved the raising of Holstein calves to a milking stage, either to be used in its own dairy operations or to be sold to other dairymen for use in their herds. Bramet was controller of River Ranch.

The transaction as contemplated at that time was that Herbert and George jointly would pay $330 per calf to River Ranch. For that sum, River Ranch would purchase a heifer calf and maintain her for approximately 28 months, until she had borne a calf and was ready for dairy use. If the calf were to die or be culled for any reason prior to entering the milking stream of a dairy, the Ranch would either substitute another cow or repay Herbert and George $330. Petitioners did not have a license to ship or market milk, but it was contemplated that River Ranch would lease the mature cows or use its best efforts to lease them to a reliable dairy.

Herbert and George were told that when a cow was placed with a dairy, they could expect to receive $72 per year for her milk production (less a 20-percent commission paid to River Ranch for its services) and an average of about $17.50 per year from the sale of her calves ($28 for a heifer and $7 for a bull calf). Each milch cow was expected to have a calf each year and to produce milk as part of a dairy herd for about 305 days per year. After the cow had reached the age when she was no longer able to produce milk economically—usually about 3

years—she would be sold at an estimated price of $200. During these discussions, Herbert, George, and Bramet also considered the tax advantages that the transaction would present.

On August 12, 1963, petitioners entered into an "Agreement to Raise Dairy Herd" with River Ranch, as follows (references to Wiener therein being to Herbert, George, and their wives):

1. That River Ranch will purchase, pick up and raise Holstein heifer calves for and on behalf of Wiener. The cost of purchasing such calves will in most instances be somewhat in excess of the established market price for such animals in order that River Ranch may select calves of superior quality from the higher producing dairies. It is the intent of River Ranch that where possible such calves will be selected from artificially inseminated dams, although River Ranch shall exercise its own judgment and discretion in this regard.

2. River Ranch will charge Wiener the sum of Three Hundred Thirty Dollars ($330.00) to completely care for each calf, such charge to include but not be limited to all labor, feed, breeding, veterinary care, supervision and overhead charges including death and sterility costs, until said calf shall mature to the age of approximately twenty-eight (28) months. In the event that there shall be a major change in such costs a mutually agreed adjustment reasonably commensurate to such change will be negotiated in said raising price.

3. River Ranch will make every effort to breed each heifer in order that the freshening date will approximate twenty-eight (28) months of age for each of said heifers.

4. Approximately sixty (60) days before the calving date for each animal, River Ranch will diligently undertake to enter into the necessary arrangements to have said animal milked for Wiener and will execute milking contracts for and on behalf of Wiener; that a copy of such proposed milking contracts which the parties approve is attached hereto, marked Exhibit "A" incorporated herein, and by this reference made a part hereof as though herein set forth at length.

(a) River Ranch will charge Wiener Twenty Percent (20%) of the milking income as and for costs of supervision, breeding, collection, overhead, etc., and will remit the balance to Wiener. Each remittance advice will show: (a) Lease number and (b) period covered by remittance.

(b) In the event an animal is returned by the dairy, River Ranch will in its sole and exclusive discretion elect to enter into a contract with another dairy under the terms and conditions of Exhibit "A" or sell such animal. River Ranch will notify Wiener of its determination and promptly deliver a copy of the new milking contract or the proceeds of the sale.

(c) In the event of the death of an animal River Ranch will whenever possible obtain a "Death Certificate" and forward a copy thereof to Wiener, or alternatively, will notify Wiener of the death and the identification number of the deceased animal.

(d) In the event River Ranch is not successful in obtaining a dairy to execute a milking contract per Exhibit "A" and to discharge its responsibilities pursuant to the terms and provisions thereof for any one or several animals, then said animals shall be sold by River Ranch and the proceeds of such sale promptly forwarded to Wiener.

5. Until an animal has become subject to a "Milking Agreement" River Ranch may co-mingle Wiener's animals with its own as well as animals belonging to others; to insure uniform treatment the identity of Wiener's animals will not be disclosed to ranch employees.

6. It is the intent of the parties to the within agreement that this agreement is being entered into for an indefinite period and it is contemplated that it shall continue for a period of many years; the parties hereto declare that if each had not had the assurances of the other as to this long range intention that the within arrangement would not have been undertaken; nevertheless, it is understood and agreed that should it become necessary for either party to withdraw from the within agreement either may do so upon giving thirty (30) day written notice of termination to the other. In the event that such notice of termination shall be served upon River Ranch by Wiener, River Ranch shall have a lien upon and the right to retain so many of Wiener's animals as shall be reasonably required to secure any unpaid liability which Wiener may have to River Ranch; and, at the sole election of River Ranch, such animals may be sold and the proceeds utilized to discharge any such liability. In the event that such notice of termination shall be served upon Wiener by River Ranch then, at the exclusive option of Wiener, River Ranch shall be obligated to raise all calves started to sixty (60) days before freshening, and, additionally, at the option of Wiener be further obligated to sell such animals for Wiener.

7. It is further expressly understood and agreed by and between the parties hereto that the covenants and agreements hereof shall apply to and bind the heirs, executors, administrators, and assigns of the respective parties hereto, and it is further expressly agreed that said dairy herd shall not be encumbered in whole or in part except with the written consent of River Ranch.

Attached to the above agreement as exhibit "A" was a signed "Milking Service Agreement," also dated August 12, 1963. Under the terms of this agreement, petitioners were obligated to deliver to River Ranch 26 dairy cows per month, starting in December 1965, until the total had reached 303 cows. These cows were to be delivered either to River Ranch at Mira Loma, Calif., or to Dewer Dairy, owned and controlled by River Ranch, at Mesa, Ariz. River Ranch was to pay all the costs of feeding and maintaining the cows and $72 per year for the use of such cows.

In view of petitioners' concern about the possibility of losing their investment through death, disease, or other catastrophe affecting their herd, this written agreement was modified by an oral one. To protect them against such risks of loss, River Ranch agreed to refund the $330 paid in by petitioners for each animal in the event that River Ranch failed to deliver a mature cow and rent her to a reliable dairy.

These agreements did not cause any significant change in the operation of River Ranch. Its calf buyer continued to make daily rounds of the dairies in the Chino Valley area, purchasing the calves to be raised at the Ranch. The bills of sale received by the calf buyer continued to show River Ranch as the purchaser. The buyer issued a numbered check for each calf he bought and placed a tag bearing the same number in the ear of the calf. Records bearing these check numbers were then set up in the Ranch office for each calf. These records, which were kept on cards as well as on a computer tape,

reflected for each calf its number, sire, dam, owner, breed, birth date, purchase date, seller, and purchase price.

When the calves were between 3 and 6 months old, they were all branded with the River Ranch brand, and then at the age of about 6 months, they were all shipped to a ranch in Idaho, owned by Winslow B. Whiteley (hereinafter Whiteley), where they were maintained for about 16 to 18 months.

River Ranch raised calves for a number of dairies, in addition to its own, and each calf's owner was identified by a designated number. These assigned numbers used by River Ranch were the only records indicating that petitioners owned any interest in the calves.

Under the terms of an agreement between River Ranch and Whiteley, the latter was entitled to one-half of the calves raised by him. The agreement in effect prior to September 29, 1965, provided that the animals would be divided equally with "no choice to either * * * [Whiteley] or * * * [River Ranch] in making this division." A new agreement, which became effective on that date, was premised on there being an equal division of the proceeds from the sale of the animals, but further provided that—

If there is any division of heifers made, there will be no choice as between * * * [Whiteley] and * * * [River Ranch] and the division will be made using alternate numbers in a numerical sequence covering the animals which are to be divided.

About 60 days before the heifers were ready to enter the dairy stream, they were returned to River Ranch at Mira Loma, Calif. When they bore their calves, they either were used to replace cows on the dairy stream or were sold to other dairies.

When petitioners indicated they wished to acquire a cow, River Ranch would make an entry in its records indicating that two calves were "owned" by petitioners. This procedure was followed in recognition of River Ranch's agreement with Whiteley that he would own one-half of all the animals which he cared for in Idaho. Only the employees in River Ranch's recordkeeping office knew of the arrangement between River Ranch and petitioners. About 6 months after the entry was made, petitioners were billed for a $28 "purchase price" and a $302 "raising cost" for each animal that they ordered.

When the calves designated as owned by petitioners were brought back from Idaho, they were either sold or placed in a dairy. If they were sold, petitioners were refunded $330 per cow, regardless of the amount realized from the sale. If they entered a dairy, petitioners were informed for the first time of the particular cows which they owned. When the animals were sold, River Ranch was designated on the bill of sale as the seller.

86

During the period from August 12, 1963, until September 5, 1966, petitioners jointly, except as otherwise noted, were billed for the following amounts by River Ranch:

| Date | Number of cows | Cost of calves | Cost of raising |
|---|---|---|---|
| Jan. 27, 1964 | 303 | $8,484 | $36,828.16 |
| Mar. 24, 1964 | | | 30,210.63 |
| June 4, 1964 | | | 24,467.21 |
| Dec. 3, 1964 | 86 | 2,408 | 26,204.00 |
| Dec. 16, 1964 | 121 | 3,388 | 36,523.00 |
| Dec. 21, 1964 | 91 | 2,548 | 27,434.15 |
| Dec. 24, 1964 | 23 | 644 | 6,848.21 |
| Dec. 20, 1965 [1] | 121 | 3,388 | 36,542.00 |
| Dec. 20, 1965 [2] | 106 | 2,968 | 32,012.00 |
| Sept. 5, 1966 [1] | 75 | 2,100 | 22,650.00 |
| Sept. 5, 1966 [2] | 91 | 2,548 | 27,482.00 |
| | 1,017 | 28,476 | [3] 307,201.36 |

[1] These amounts were billed to Herbert.
[2] These amounts were billed to George.
[3] The $67.36 difference between this amount ($307,201.36) and the $307,134 anticipated expense ($302×1,017) has not been explained.

Petitioners paid the amounts of such bills.

Shortly before the first cows were due to enter a dairy, River Ranch informed petitioners that it would be unable to pay the $72 fee provided in the "Milking Service Agreement" and that it would likely be unable to place the animals in another dairy as provided by the "Agreement to Raise Dairy Herd." Petitioners then agreed to temporarily accept only $19.80 per year for each cow placed at Dewer Dairy. During this period, both George and River Ranch attempted to locate some other reliable dairy to milk the cows for a more profitable rental. They were unable to do so. Finally, during 1967, petitioners decided to liquidate their herd.

Cows designated in the River Ranch records as purchased for petitioners were either sent to Dewer Dairy under the modified rental agreement, or sold and the $330 payment for each animal refunded to petitioners as follows:

| Date | Sent to Dewer Dairy | Number sold at River Ranch | Date | Sent to Dewer Dairy | Number sold at River Ranch |
|---|---|---|---|---|---|
| 1965 | | | 1966 | | |
| Dec. 18 | 18 | | July 14 | 31 | |
| | | | Aug. 4 | 19 | 12 |
| 1966 | | | Sept. 2 | 10 | |
| Jan. 15 | 21 | | Oct. 5 | 16 | |
| Jan. 22 | 25 | | Oct. 12 | 30 | |
| Feb. 18 | 23 | | Nov. 9 | 31 | |
| Mar. 19 | 24 | 15 | Dec. 14 | 31 | |
| Apr. 6 | 31 | 18 | 1967 | | |
| Apr. 19 | 26 | | Jan. 11 | 13 | 13 |
| May 6 | 26 | 15 | Feb. 2 | 11 | 13 |
| June 3 | 20 | 13 | Mar. 3 | | 13 |
| July 6 | 22 | 13 | | | |

| Date | Sent to Dewer Dairy | Number sold at River Ranch | Date | Sent to Dewer Dairy | Number sold at River Ranch |
|---|---|---|---|---|---|
| *1967* | | | *1968* | | |
| April | | 13 | February | | 26 |
| May 16 | 21 | 9 | March | | 26 |
| June | | 24 | April | | 17 |
| July | | 15 | May | | 19 |
| August | | 22 | June | | 18 |
| September | | 27 | July | | 32 |
| October | | 26 | August | | 23 |
| November | | 21 | September | | 26 |
| December | | 26 | October | | 30 |
| *1968* | | | November | | 16 |
| January | | 27 | Total | 449 | 568 |

After October 31, 1970, petitioners no longer owned any cows. By that date, they had sold all their cattle. The decision as to whether to remove a cow from the milking stream and sell her was left to the sole discretion of the employee of River Ranch who was responsible for the care and milking of the cows.

On their returns for 1964, 1965, and 1966, petitioners claimed the following deductions as cattle-raising costs:

| Year | Herbert | George |
|---|---|---|
| 1964 | $94,258 | $94,258 |
| 1965 | 36,542 | 32,012 |
| 1966 | [1] 22,650 | 27,482 |
| Total | 153,450 | 153,752 |

[1] Herbert actually claimed a deduction for $24,750, but he has conceded that this deduction was overstated by $2,100.

On their returns for 1966 through 1970, petitioners reported [1] the following total amounts of income from this venture:

| | Herbert | George |
|---|---|---|
| Sale of milk and calves (ordinary income) | $16,810 | $16,810 |
| Sale of cows (long-term capital gain) | 136,498 | 136,800 |
| Total | 153,308 | 153,610 |

During 1966 through 1969, the following numbers of cows which had been sent to Dewer Dairy died:

| Year | Number of animals |
|---|---|
| 1966 | 3 |
| 1967 | 6 |
| 1968 | 11 |
| 1969 | 9 |
| Total | 29 |

[1] These figures take into account certain stipulated adjustments to petitioners' reported incomes for those years.

Taking into account the total amounts invested by Herbert and George, the losses they suffered from the death of some cows while in dairy use, and the income which they received from the venture, Herbert and George each lost approximately $548 from the entire transaction.

Respondent determined that the deductions claimed for the cost of raising cows during 1964 and 1965 are not allowable because—

it has not been established that any part of * * * [the amounts paid] to the River Ranch Company represented the payment of ordinary and necessary expenses attributable to a dairy herd operated by or for * * * [the petitioners].

OPINION

The general rule is that costs incurred in the acquisition or development of capital assets and other property used in a trade or business are to be capitalized. Sec. 263(a).[2] However, section 162(a) has been interpreted to allow current deductions for expenses paid in raising livestock. *United States* v. *Catto*, 384 U.S. 102, 106 (1966). In this connection, section 1.162–12, Income Tax Regs., contains the following:

The purchase of feed and other costs connected with raising livestock may be treated as expense deductions insofar as such costs represent actual outlay * * *. Amounts expended in purchasing work, breeding, or dairy animals are regarded as investments of capital, and shall be depreciated * * *

As was observed in *Maple* v. *Commissioner*, 440 F. 2d 1055, 1056–1057 (C.A. 9, 1971), affirming a Memorandum Opinion of this Court:

If a dairy farmer buys his cows fully mature, he must capitalize their purchase price; if he buys them as calves, he may deduct the cost of raising them to maturity, even though that expense is as much a cost of obtaining an income-producing business as is the purchase of the mature cows.* * *

* * * Expenses of maintaining agricultural items in the preproductive state are deductible if they are sufficiently similar to the expenses that will be required to maintain them once they are productive. * * *

See also Mim. 6030, 1946–2 C.B. 45.[3]

Relying upon these interpretations of section 162(a), petitioners contend that they purchased heifer calves at a cost of $28 per calf and paid River Ranch $302 per calf to raise them until they were ready to be used for milking purposes. On this theory, petitioners claim deduc-

---

[2] All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.

[3] This mimeograph was declared obsolete and not determinative for future transactions in Rev. Rul. 67–123, 1967–1 C.B. 386. It was in effect, however, during the years relevant to this case.

tions for 1964 and 1965 of $302 per animal. They also claim depreciation deductions for the cows after they started producing milk.[4]

Respondent challenges the claimed deductions on alternative grounds. First, he contends that the entire arrangement between petitioners and River Ranch was a sham, a facade, and a pretext to obtain tax deductions for petitioners and interest-free borrowings for River Ranch; he asserts that petitioners purchased neither the calves nor the feed and other items required to raise the animals. Alternatively, respondent contends that if ownership of the animals was acquired by petitioners, they bought mature cows—not calves—and, thus, must capitalize the entire advancement of $330 per animal; if this alternative position is sustained, respondent concedes that petitioners are entitled to deductions for depreciation under section 167(a) [5] for the animals after their dairy use began.[6]

On consideration of the numerous exhibits and the voluminous testimony, we reject respondent's first contention but sustain his alternative position. We hold that petitioners did not acquire ownership of the animals until they had borne calves and were leased for dairy use; consequently, petitioners must capitalize the entire outlay of $330 per

---

[4] In years subsequent to 1965, some of the cows were sold, and petitioners claim that sec. 1231(b) causes their gains on the sales to be treated as long-term capital gain. Sec. 1231 provides in relevant part:

SEC. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS.

(a) GENERAL RULE.—If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sale or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. * * *

\* \* \* \* \* \* \*

(b) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For purposes of this section—

\* \* \* \* \* \* \*

(3) LIVESTOCK.—Such term also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition. Such term does not include poultry.

[5] SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, or

(2) of property held for the production of income.

[6] As a second alternative, respondent contends that if petitioners acquired ownership of the animals while they were calves, a portion of the $330 allocable to each animal was a deposit, not currently deductible. Our disposition of the other arguments renders unnecessary the consideration of this contention.

animal. As conceded by respondent, however, petitioners are entitled to deductions for depreciation of the 18 heifers that bore calves and were used for dairy purposes during 1965; the parties have stipulated that the costs of the cows should be depreciated over a 3-year period, and the evidence shows that each animal had a salvage value of $200.

While respondent's argument that the entire arrangement was a sham has superficial appeal, we must reject it. We cannot regard as decisive respondent's argument that the transaction lacked substance because tax-avoidance motives were paramount in the formulation of the arrangements; rather, we must seek to ascertain "whether what was done, apart from the tax motive, was the thing which the statute [i.e., secs. 162(a), 167(a), and 1231, and the regs. sec. 1.162–12] intended." *Gregory* v. *Helvering*, 293 U.S. 465, 469 (1935). See also *Knetsch* v. *United States*, 364 U.S. 361, 365 (1960); *Amor F. Pierce*, 37 T.C. 1039 (1962), affirmed per curiam 311 F. 2d 894 (C.A. 9, 1962). "If there is, under the realities of the terms of the transaction, some reasonable hope of the transaction appreciably affecting the taxpayer's beneficial interest other than by tax reduction, the transaction would not be a sham for tax purposes." *Bridges* v. *Commissioner*, 325 F. 2d 180, 184 (C.A. 4, 1963), affirming 39 T.C. 1064 (1963). Neither the labels which the parties have assigned to the elements of the transactions nor the bookkeeping entries are conclusive. *George G. Lynch*, 31 T.C. 990, 995, 998 (1959), affd. 273 F. 2d 867 (C.A. 2, 1959).

The undisputed fact is that petitioners actually made an outlay of $330 per animal, and there is no evidence that petitioners had any right to have this amount returned to them after the animal had borne a calf and had been leased to a dairy. The testimony, telescoped in our Findings, is that petitioners, at the time they entered into the transaction, expected to realize from their $330 investment in each milch cow about $72 per year as rent and a calf which could be sold for $28 if a heifer or $7 if a bull, plus the value of the cow as a cull (about $200).[7] Under the terms of the agreements with River Ranch, petitioners had the burdens and risks of ownership with respect to cows leased to a dairy, e.g., the risks of loss through death, disease, or other cause. Moreover, they bore the risk of loss attributable to a shorter milking life on the part of any of the cows, as well as losses resulting from the cancellation of the leases and a diminution of the sales value of culls. Also, petitioners acquired the rights to gains through rental payments, from the sales of calves, and from the sales of culls.

---

[7] George testified that, based on a capital investment of $330, he anticipated an annual return of "slightly in excess of 30%." Even under the reduced rental payments of $1.65 per month ($19.80 per year), he estimated the return at about 10 percent on the investment. Neither of these percentages is adjusted for depreciation.

True, the "Agreement to Raise Dairy Herd" and the "Milking Service Agreement" were not carried out precisely as written, but none of the oral modifications took away from petitioners the risks of loss with respect to the animals once they had borne calves and had entered dairy use. Indeed, George testified that River Ranch declined to assume any risks of loss after the cows had entered a dairy's milking stream. Nor did the oral modifications alter petitioners' right to rental payments for use of the cows, the proceeds of the sales of their calves, or the proceeds of the eventual sales of the culls. Since there was a real possibility of gain as well as a risk of loss in the transaction, it was not a sham. *Bridges* v. *Commissioner, supra* at 185.

In support of his sham theory, respondent offered testimony to show that one ordinarily enters the dairy business by purchasing an established dairy with "shipping rights"—the contractual rights to sell milk to a processor or distributor—because those rights are essential to the profitable operation of such a business. Petitioners had no shipping rights, and only a limited number of such rights are available. Petitioners personally, therefore, had no way of profitably selling the milk produced by the cows. But they never intended to establish an independent dairy. They planned from the outset to lease their herd to established dairies. They expected to be able to rent the herd to River Ranch or some other reliable dairy. When Dewer Dairy found itself unable to continue to use petitioners' cattle, the testimony is that Carnation Milk Co., the Peter Pan Dairy, and representatives of the Mexican dairy industry all expressed interest in a rental arrangement.[8] Petitioners' lack of shipping rights does not show that the transaction was a sham.

Respondent makes much of the failure of petitioners to obtain bills of sale for the calves and to register a brand and have the calves branded as theirs. If petitioners had actually purchased the animals as calves, the use of River Ranch's brand on them might have constituted a technical violation of California law.[9] However, we do not think the point is decisive. The issue posed by respondent's argument

---

[8] In *Harry H. Kem, Jr.,* 51 T.C. 455 (1968), affd. 432 F. 2d 961 (C.A. 9, 1970), the issue involved the allowability of depreciation on a rented breeding herd, and the bona fides of the transaction was not challenged by respondent.

[9] River Ranch's brand was recorded in the State of California. Cal. Agric. Code sec. 332.2 (West 1954) provides:

"Brands for the purpose of establishing or indicating ownership of cattle may be recorded under the provisions of this chapter. Brands for other purposes shall not be recorded. (Added Stats. 1947, c. 1099, p. 2522, sec. 6.)"

And sec. 338.1 provides:

"It shall be unlawful for any person to use a brand on cattle indicating ownership unless the cattle are owned by him or he has been authorized by the owner of the cattle and the brand is recorded under the owner's name and is on file with the Bureau of Livestock Identification. (Added Stats. 1953, c. 342, p. 1611, sec. 14.)"

The violation of these provisions constitutes a misdemeanor. Sec. 438.2, Cal. Agric. Code (West 1954).

is with respect to the ownership of the animals as between petitioners and River Ranch. The vesting of River Ranch with the indicia of ownership, such as the placing of its brand on the calves and its designation in the bills of sale as purchaser, is significant primarily in relation to the rights of third parties. Cf. *Meadows* v. *Hampton Live Stock Commission Co.*, 55 Cal. App. 2d 634, 131 P. 2d 591, 592 (Ct. App. 1942). It does not negate the rights of ownership established in petitioners by their agreements with River Ranch.[10]

We agree with respondent that the fact that petitioners' total receipts under the agreements approximate the total amounts paid to River Ranch is a suspicious circumstance. We also agree that the overall economic consequences of a transaction are a factor which may properly be taken into account in assessing its reality. See, e.g., *Knetsch* v. *United States, supra* at 365; *Goldstein* v. *Commissioner*, 364 F. 2d 734, 739 (C.A. 2, 1966), affirming 44 T.C. 284 (1965). But it is one thing to measure the potential overall economic consequences of a transaction when it is initiated, and quite another thing to measure those consequences at the end of the line—after the taxpayer has weathered the risks of loss and has failed in his quest for a substantial gain. When petitioners' deal with River Ranch was negotiated, they thought they would make a substantial overall profit apart from the tax advantages. That their expectations did not materialize is explained in part by River Ranch's inability, not foreseen when petitioners entered into the transaction, to place a large number (568 out of 1,017) of the cows with a dairy. We reject respondent's argument that the transaction was a sham.

We hold, however, that petitioners did not acquire ownership of the animals until after they returned from the Whiteley Ranch and had been leased to a dairy. Paragraph 4(d) of the "Agreement to Raise Dairy Herd," set forth in our Findings, provides that if River Ranch were unable to place a cow with a dairy for milking, it would sell the cow and remit the proceeds to petitioners. However, George testified that he "was not willing to run the risk of the herd being wiped out with a disease or * * * [other] catastrophe. No matter how much profit there was in it, * * * [he] did not wish to risk * * * [his] capital against that exigency." At his insistence, River Ranch agreed, as consideration for petitioners' investment in each animal, to provide a cow suitable for milking and to rent her to a dairy, or return the $330, regardless of the amount received on the sale of the cow. Pursuant to this oral understanding, a refund of $330 was received by petitioners with respect to each of 568 cows that could

---

[10] The use of River Ranch's brand on the calves is consistent with our conclusion that petitioners did not acquire ownership of the calves at the time they were bought, but acquired them only after they had matured and had been leased to a dairy.

not be placed with a dairy. Thus, it is clear that petitioners incurred no significant risks of loss until an animal had matured and entered a dairy.

The evidence is also clear that the specific animals acquired by petitioners were not, and could not be, identified in the records of River Ranch with any degree of certainty until they had reached maturity. As detailed in our Findings, for each cow petitioners wished to acquire, River Ranch purchased two calves, both of which it designated in its records by use of a number as "owned" by petitioners. At this point, no one was able to determine which, if either, of these animals petitioners would eventually receive as theirs.

Both calves were included in a herd of other calves sent by River Ranch to be raised in Idaho. The raising agreement between River Ranch and Whiteley provided that Whiteley would receive one-half of all the animals which he raised (or their proceeds) as compensation for raising the other one-half; this division was to be made on a purely random basis. Consequently, one, both, or neither of the animals designated as owned by petitioners might be awarded to Whiteley. Which animals petitioners would acquire could not be ascertained until the division was made. Similarly, if any of the animals designated on River Ranch's records as "owned" by petitioners proved unsuitable for dairy use, some other cow might be substituted.

In short, prior to the time when a cow was rented to a dairy and petitioners were informed of its identification number, no one could designate any particular animal as one on which the success of petitioners' investment depended. Thus, as we view petitioners' agreement with River Ranch, it did not call for the ranch to raise petitioners' calves for a predetermined period, but rather called for the purchase of mature cows.

Petitioners appear to recognize that River Ranch's obligation to deliver a leased milch cow or to refund the $330 paid with respect to each animal relieved them of any substantial risks of loss prior to the animal's maturity. They seek to avoid the implications of this aspect of the agreement on the ground that it was merely an insurance arrangement for which they paid $45 of the $330, arguing that "The fact that Ranch was the 'insurer' rather than a third party is of no moment."

We think this argument is specious. There is nothing in the written agreements supporting it. We think it is incredible that River Ranch, for a fee, would have "insured" another party's animals against the possibilities that, when mature, they would not be suitable for milking or that they could not be rented to a dairy. These are not the kinds

of risks ordinarily associated with insurance. While George's testimony at one point refers to an insurance agreement, his testimony, and that of Bramet, at another point is that River Ranch's costs of buying the calves and raising them to maturity were $330 per animal. We think the "insurance" theory is purely an afterthought.

Finally, petitioners argue that they bore the ultimate risk of loss because River Ranch might become bankrupt or insolvent.[11] We note that River Ranch's operations include dairies in California, Oregon, and Arizona. Bramet described it as "one of the largest raisers of Holstein cattle in California." In any event, petitioners fail to explain how the apparently remote possibility that River Ranch would become insolvent establishes that they acquired ownership of the animals before they were leased for dairy use. Their risk of loss under this insolvency theory was the same whether their $330 payments were loans, purchases of calves, or purchases of mature and leased cows. We think the possibility that River Ranch might have become insolvent is irrelevant to the issues before us.

To reflect the foregoing,

*Decisions will be entered under Rule 50.*

---

[11] This theory seems to be somewhat contradictory to petitioners' insurance theory. If River Ranch's financial position was uncertain, why would petitioners pay it $45 per animal for insurance?