WATSON LAND COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Watson Land Co. v. Commissioner
Docket No. 9211-77.
United States Tax Court
T.C. Memo 1983-187; 1983 Tax Ct. Memo LEXIS 601; 45 T.C.M. (CCH) 1206; T.C.M. (RIA) 83187; April 5, 1983. *601 P, the owner of a large, master-planned industrial park, leased most of its buildings to industrial tenants on a net, net, net basis. As a result of the lease provisions, if a component wears out during the term of a lease, it must be replaced by the lessee. Held: Respondent's determination of useful lives of building shells sustained. Held further: P is not entitled to depreciation deductions respecting the entire cost of certain components over their physical useful lives, but rather over a longer period as contended by respondent. Held further: Useful lives of other components determined. Held further: Useful lives of buildings depreciated on the composite method determined. William M. Bitting and *602 Randall R. Morrow, for the petitioner. Michael C. Cohen, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined the following deficiencies in petitioner's Federal income taxes: Year
Deficiency
1973
$231,956
1974
276,120
1975
298,787
Other issues having been conceded by the parties, the issues remaining for our decision are: (1) Whether the useful lives assigned by petitioner to various components of buildings depreciated on the component method of depreciation were proper under section 167; [1] and (2) whether the composite useful lives assigned by petitioner to building depreciated on the composite method of depreciation were proper under section 167. FINDINGS OF FACT Some of the facts have been stipulated. The stipulated facts and the exhibits attached to the stipulation are incorporated herein by this reference. Petitioner Watson Land Company was incorporated on April 1, 1927. Petitioner is a California corporation, having its principal office located *603 at 3435 Wilshire Boulevard, Los Angeles, California. For each of the taxable years ended December 31, 1973, through December 31, 1975, petitioner filed its Federal income tax returns with the Internal Revenue Service Center at Fresno, California. Petitioner was incorporated for the purpose of engaging in the real estate business. Prior to 1960 petitioner's real estate holdings were primarily used as farmland. From time to time, parcels were sold to others for housing or for industrial use. In the early 1960's petitioner decided to retain and to develop its remaining land for its highest and best use, which was and presently is industrial use. Petitioner began doing business as Watson Industrial Properties and its primary purpose became the development of Watson Industrial Center (WIC herein) in the City of Carson. From its inception WIC was designed as a large, master-planned industrial park. Virtually all the buildings in WIC are large single-story structures with concrete tilt-up walls, glue-lam beam roofs, and concrete floors. They average 125,000 square feet in size, with office space accounting for approximately 3 percent of the total area. Building coverage is approximately *604 45 to 50 percent of the developed land area. WIC is bisected by the San Diego Freeway and adjoins two of its on-and-off ramps. The Harbor and Long Beach Freeways are located approximately 1 mile from WIC. Of six streets bordering WIC, four are four-lane thoroughfares. Rail spurs from the main line of the Southern Pacific Railroad serve WIC. WIC is the industrial center nearest to the Los Angeles and Long Beach Harbors. It is only 3 miles from these deep water ports, and thus, in the Interstate Commerce Commission "Harbor Free Zone." Preferential rates are in effect for truck transportation between the harbors and the warehouses in this zone. Depending on traffic conditions, Los Angeles Airport is between 15 and 30 minutes by freeway from WIC. Long Beach Airport, which is a modern, jet-age facility, is approximately 10 minutes by freeway from WIC. Passenger and freight services and facilities for stowing company and privately owned aircraft are available at both airports. WIC is zoned M-4. This zoning classification generally permits light, medium, and heavy industrial uses, including uses of the type tending to be obnoxious to neighbors.Lands predominantly used for *605 industrial purposes border WIC on three sides. Petitioner's "Fact Sheet" on WIC indicates that the City of Carson is responsive to industrial requirements and that over 53 percent of the city is devoted to industrial development. Petitioner leases most of its buildings to industrial tenants on a net, net, net basis. As of January 1, 1975, the average lease life was approximately 18 years. Petitioner had two standard lease agreements, one for tenants moving into newly constructed buildings and one for tenants moving into premises which had already been improved. These standard leases, which did not differ in any material respect, read, in pertinent part, as follows: ARTICLE IX
Repairs, Maintenance, Alterations and Removal of Equipment
9.1. Lessee, at its sole cost and expense, shall maintain the entire demised premises in a clean and orderly condition and appearance, state of repair, and operating order; except, however, Lessor shall maintain landscaping at Lessee's expense. Without limiting the generality of the foregoing, Lessee shall perform all maintenance detailed in paragraphs I (exterior repainting), J (resurfacing paved areas), and K (mechanical service *606 controls) of the Performance Standards of the Watson Industrial Center attached hereto as Exhibit A; and Lessee shall promptly make all necessary repairs and perform such other required maintenance, interior or exterior, ordinary as well as extraordinary, as may be required to maintain the demised premises in such clean and orderly condition. For example, the roof of the building shall be kept free of debris and all roof drains shall be kept fully open at all times to allow for maximum water drainage.Lessee shall also maintain any of Lessee's property visible from outside the building in the same condition with the surfaces thereof painted at such intervals and with such colors as Lessor shall approve. At the termination of this Lease Lessor shall approve. At the termination of this Lease Lessee shall surrender the improvements thereon in a clean and orderly condition, in proper and efficient operating order, and in full compliance with all Federal, State and Local laws, rules, regulations [,] ordinances, and administrative directives. If Lessee fails to maintain and repair and demised premises or any of Lessee's property as herein required, Lessor shall have the right, but *607 not the obligation, after ten (10) days prior written notice to Lessee specifying the maintenance or repairs required, to enter upon the demised premises and cause such maintenance or repairs to be performed. In that event, Lessee agrees to pay Lessor, within ten (10) days, of receipt of Lessor's invoice, as additional rent, for all repair and maintenance costs incurred by Lessor, plus an overhead allowance to Lessor of ten percent (10%) of such cost.
9.2. Lessee shall have the right, subject to prior written approval of Lessor, to make such additions, alterations, changes and improvements to the demised premises as Lessee shall deem necessary or desirable; however, no addition, alteration, change or improvement shall be made which will weaken the structural strength, lessen the value of, interfere with, or make inoperable any portion of the building or the building service equipment, or change the architectural appearance of any building. All additions, alterations, changes and improvements shall be made in workmanlike manner, in full compliance with all building laws and ordinances applicable thereto. They shall become a part of the demised premises, and become the property *608 of Lessor when installed; and, unless Lessor shall require removal thereof as required in Paragraph 16.2 of Article XVI, all such improvements, including all building service equipment improvements, shall remain in and be surrendered as a part of the demised premises upon the termination of this Lease. Lessee shall furnish Lessor with a set of "as built" drawings which accurately set forth the nature and extent of improvements made by Lessee to the demised premises. The phrase "building service equipment" shall include, but not be limited to, equipment and property ordinarily necessary or convenient for the operation and utilization of a building, such as heaters, air conditioners, solar panels, power panels, transformers, light fixtures, sprinklers, * * *. Building service equipment shall also include any related power installations, plumbing installations, water installations, air conditioning * * *. Building service equipment shall also include installations affixed to the building which serve machinery and equipment such as, but not limited to, conveyers, crane Ways, dust collectors, and paint booths.
9.3 Lessee shall have the right, without Lessor's prior written *609 approval, to install, within the demised premises Lessee's machinery, equipment, trade fixtures, furniture and furnishings (hereinafter collectively called "Lessee's Equipment"). Provided however, Lessee shall notify Lessor in writing and Lessee shall obtain Lessor's prior written approval before the installation of heavy machinery, heavy equipment, or heavy trae fixtures, on the demised premises and prior to placing any load on the roof or attaching any load to the walls or the underside of the roof of any building. Lessee shall not place any load on the floor of any building in excess of the design load. Lessee shall not install any of Lessee's Equipment in such manner to weaken the structural strength of the building, interfere with, or make inoperable any portion of the building or the building service equipment. If Lessee makes any addition, alteration, change, or improvement to the demised premises described in paragraph 9.2 without Lessor's consent; or if Lessee installs any of Lessee's Equipment in violation of this paragraph 9.3; then Lessee agrees, upon receipt of written notice from Lessor, to promptly remove, replace, or otherwise correct such installations *610 in such manner as Lessor shall reasonably require and direct; and Lessee, upon demand, shall reimburse Lessor, as additional rent, for all reasonable architect's, engineer's and legal fees incurred in connection therewith. If Lessee or any person with whom Lessee is engaged in business causes any structural damage to the demised premises, Lessee assumes all risk of such damage * * * 9.5 Lessor shall not be obligated to maintain nor to make any repairs, replacements, or renewals of any kind, nature or description whatsoever to the demised premises or any buildings or improvements thereon, except as provided in Article XIII hereof, and Lessee hereby expressly waives all rights to make repairs at Lessor's expense under any law now or hereafter enacted. 9.6 Lessee shall comply with and abide by all Federal, State, County, Municipal and other governmental statutes, ordinances, laws, and regulations affecting the demised premises, the improvements thereon, the business to be conducted therein and thereon by Lessee, or any activity or condition on or in the demised premises. Lessee warrants that Lessee's business and all activities to be performed by Lessee respecting the demised *611 premises complies with such statutes, ordinances, law and regulations; and Lessee agrees to change any such activity or install necessary equipment, safety devices, pollution control systems, or other installations at any time during the Lease term to so comply therewith. Lessee agrees not to commit or permit waste upon the demised premises. ARTICLE XII
Damage or Destruction of Demised Premises
12.1 In the event the buildings or other structures on the demised premises are damaged or destroyed, then Lessee shall repair and restore such improvements then owned by Lessor to their condition prior to said damage or destruction and this Lease shall continue in full force and effect and Lessee shall commence such repair or rebuilding with reasonable diligence and complete the same within 180 days after commenced. There shall be an abatement of rental payable under the provisions of Article IV only by reason of such damage or destruction or the time required to repair or rebuild in the proportion that the part of the demised premises rendered unusuable to Lessee bears to the whole thereof. The net proceeds, if any, of may insurance maintained in force at the expense *612 of Lessee, with the proceeds thereof payable to Lessor or any encumbrancer, shall be made available to Lessee to be applied to the cost and expense of repair or rebuilding such damage or destruction, subject to reasonable conditions and payable on the usual architect's certificates; but Lessor or any encumbrancer holding said insurance proceeds may withhold until completion and the expiration of the period within the time that mechanics' or materialmen's liens may be filed and until receipt of satisfactory evidence that no liens exist, an amount reasonably necessary to insure completion of such repairs or rebuilding. Any amount required to complete such repairs or rebuilding in excess of the insurance proceeds, if any, payable to Lessee hereunder shall be paid by Lessee before such insurance proceeds are used. * * * ARTICLE XVI
Surrender of Premises
16.1 Upon any termination of this Lease, whether by lapse of time, cancellation pursuant to an election provided for herein, forfeiture, or otherwise, Lessee shall surrender immediately possession of the demised premises and all buildings and improvements on the same to Lessor in a clean and orderly condition and appearance, *613 state of repair and operating order, and with all improvements thereon in a good, safe, fully operable condition, ad in full compliance with all Federal, State and local laws, rules, regulations and ordinances. * * * 16.3 Upon termination of this Lease Lessee shall surrender the demised premises in a "broom-clean" condition, with all electrical, plumbing and mechanical installations in a good, safe and fully operable condition, and Lessee shall fill or repair any holes or openings made by Lessee in the walls, roof or floor of the building, remove any proturberance, and perform any maintenance or repairs required of Lessee by this Lease. If directed so to do by Lessor, Lessee shall also remove any improvements, additions or alterations made to the demised premises by Lessee and thereafter restore the demised premises to their original condition, even though such improvements by the terms of this Lease become a part of the demised premises and the property of Lessor. Thus, the lessees were required to maintain the demised premises in a clean and orderly condition and in proper and efficient operating order and petitioner was not obligated, to maintain, nor make any repairs, replacements, *614 or renewals to, the demised premises. [2]
When each of the first seven buildings and one building addition constructed by petitioner was completed, petitioner had appraisal reports prepared by the American Appraisal Company, Inc. (American Appraisal herein). These reports were prepared for the express purposes of (1) identifying each of the functional property components and its cost and (2) formulating and expressing an opinion of the estimated normal economic useful life expectancy for each o the components identified. Below are the first seven buildings for which appraisal reports were prepared and the dates on which the reports were completed: Building
Date Completed
Cormier Chevrolet Company
February 7, 1967
J.W. Carroll & Sons, Inc.
August 24, 1967
J.W. Carroll & Sons, Inc.
January 14, 1971
(Building addition)  Caine Steel Company
January 11, 1968
Huck Manufacturing Company
December 31, 1968
Akron Service Center
March 3, 1970
Mercedes-Benz of North America,
March 3, 1970
Inc.
Winchester Inn
March 3, 1970
*615 The appraisal reports separate each of the premises into five general categories: Land Improvements; Building Structure; Roof Cover and Interior and Exterior Finishes; Building Service Systems and Equipment; and Special Facilities and Equipment required by the tenant's particular use of the building. Each of these general categories is then broken down into numerous component parts, with the seven premises appraised averaging a breakdown into approximately 62 components. For example, the Land Improvement category includes such components as storm and sanitary sewerage systems, block walls, fencing, paving, and curbing; the Building Structure components include foundations, walls, doors, windows, and stairs; the Roof Cover and Interior and Exterior Finishes components include roof cover, floor coverage, acoustical ceilings, drywall partitions, and window and wall coverings; the Building Service components include piping and plumbing fixtures, wiring, lighting and electrical fixtures, and air conditioning and heating systems. For the buildings and building addition for which appraisal reports were prepared, petitioner began using and still uses the component method of depreciation. *616 The information provided by American Appraisal for these buildings was used to allocate the total cost of construction of each building among its various component parts and to determine the useful life of each component. From the useful life of each component, a straight-line depreciation deduction was calculated for each component. After having appraisal reports prepared for its first seven buildings, petitioner decided that since each new building constructed by it was of virtually the same type of construction as the appraised buildings, the results of additional reports would be repetitious. Consequently, to simplify its depreciation accounting and to avoid the time and expense of having additional appraisal reports compiled, in 1970 petitioner began using a composite method of depreciation for all its buildings constructed after 1969. Petitioner calculated a composite rate by totaling the amount of annual straight-line depreciation for all the components of its appraised buildings of concrete tilt-up type construction, [3] and by dividing the total depreciable cost of all these buildings by this total. The result was a composite life of under 28 years. Petitioner rounded *617 this figure to 30 years, giving a composite depreciation rate of 3-1/3 percent per year. For its taxable years 1973, 1974, and 1975, petitioner claimed deductions for building depreciation in the amounts of $818,660, $1,195,627 and $1,351,556, respectively, [4] using the component, straight-line method of depreciation on its first seven buildings and building addition and using the composite, 150-percent declining balance method of depreciation on most of its newer buildings. Respondent, based upon the recommendation contained in an Engineering and Valuation Report prepared by the Los Angeles Office of the District Director of Internal Revenue, [5] disallowed depreciation deductions taken by petitioner totaling $406,211, $578,228, and $642,079 in 1973, 1974, and 1975, respectively. It is respondent's position that the useful lives assigned *618 by petitioner to various building components are understated. Respondent initially essayed to analyze each of petitioner's buildings and building additions. Subsequently, respondent, for purposes of his audit and this lawsuit, agreed to consider five buildings as a representative sample of all buildings owned by petitioner and to limit his indepth examination and analysis to these five buildings: the J.W. Carroll & Sons building, including its 1970 addition; the Huck Manufacturing Company building; the Artesia Door building; the Lafayette Metals building; and the Gulton Industries building. All these buildings, other than the Lafayette Metals building, are located within WIC and consist of concrete tilt-up walls, *619 glue-lam beam roofs, and concrete floors. The Lafayette Metals building is a metal frame building, with corrugated sheet metal walls and a roof supported by tapered steel beams. The useful lives assigned by petitioner to the components of its buildings of concrete tilt-up construction depreciated on the component method and the corresponding useful lives urged upon us by respondent are reflected in the following charts: J.W. Carroll & Sons, Inc.
As used by
Cost
IRS
Petitioner
Building Structure
Total
$247,408.78
[6] 55
45
Building Service Systems
and Equipment
[7]Sewerage & Sprinkler $ 41,015.93
55
45
Piping-Water
3,192.79
55
25
Air-Conditioning Ducts
2,468.61
55
20
Electric Lighting, Wiring
& Controls  19,872.06
55
20
Electric Lighting, Panels
2,897.35
55
20
Fire Hose Cabinets
1,231.50
55
15
Plumbing Fixtures
7,919.78
25
20
Electric Lighting,
Floodlights  7,095.67
25
15
Heaters, Electric Water
326.54
25
10
Total  $ 86,020.23
Process Facilities & Equipment
Loading Ramps
$ 1,712.50
55
25
Telephone Outlets
840.70
55
20
Electric Power Process
Equipment, Connections  & Controls  12,074.50
25
20
Air-Conditioning Units
4,670.59
25
15
Ventilators, Power Roof
3,109.85
25
15
Fire Hose
727.71
25
15
Flagpole, Aluminum
591.91
25
15
Fans
$ 1,140.28
25
10
Coolers, Electric Water
1,865.92
25
10
Bumpers, Wood Dock
165.86
25
10
Pump, Sump
362.82
25
10
Total  $ 27,262.64
Land Improvements
[8]Storm Sewers $ 2,021.42
55
45
[9]All others 32,142.47
Total  $ 34,163.89
Roof Cover, Interior &
Exterior Fixtures
Acoustic Ceiling &
Insulation  $ 6,184.47
40
20
Floor Covering
1,795.43
40
10
Partitions
24,705.77
40
15
Roof Cover
16,215.84
40
15
Block Wall
2,961.62
25
20
Total  $ 51,863.13
Grand Total
$446,718.67
*620 J. W. Carroll & Sons, Inc.
(Building Addition)
As used by
Cost
IRS
Petitioner
Building Structure
Total  $174,148.46
51
41
Building Service Systems
and Equipment
[10]Sewerage & Sprinkler $ 47,887.09
51
41
Piping-Water & Vent
1,604.88
51
25
Piping-Natural Gas
4,208.77
51
25
Electric Wiring, Power
Feed including Controls
10,753.01
51
20
Electric Wiring, Lighting
including Controls
9,511.19
51
20
Fire Hose Cabinets
1,950.76
51
15
Plumbing Fixtures &
Connections
1,002.35
25
20
Smoke Vents
3,766.15
25
20
Electric Lighting Fixtures
22,296.76
25
15
Exhausters, Roof
2,869.44
25
15
Unit Heaters
3,062.74
25
10
Water Heater
83.53
25
10
Total
$108,996.67
Process Facilities & Office
Additions
Concrete Block Enclosure
$ 66,941.19
25
20
Roof Exhausters
3,629.21
25
15
Steam Coils
768.14
25
15
Evaporative Coolers
6,145.11
25
10
Drywall Enclosures
36,081.36
25
15
Air-Conditioners
2,479.66
25
15
Wall Fan
70.85
25
10
Total
$116,115.52
Land Improvements
[11]Total $ 25,942.50
Roof Cover, Interior &
Exterior Finishes
Draft Curtains, Metal
$ 3,842.35
40
20
Partitions, Drywall
529.02
40
20
Roof Cover
11,937.82
40
15
Ramps & Stoops
2,661.80
25
25
Total
$ 18,970.99
Grand Total
$444,174.14
*621 Caine Steel Company
As used by
Cost
IRS
Petitioner
Building Structure
Total
$326,140.20
60
45
Building Service Systems
and Equipment
[12]Sewer & Sprinkler $ 30,130.33
60
45
Piping-Water
154.29
60
25
Piping-Gas
195.44
60
20
Air-Conditioning Ducts
1,533.67
60
15
Electric Lighting, Switchboards
& Feed Wiring
18,043.02
60
20
Electric Wiring
685.06
60
20
Telephone Outlets & Conduit
454.65
60
20
Plumbing Fixtures &
Connections
5,869.31
25
20
Electric Lighting-Outlets,
Conduit, Wire & Accessories
8,880.08
25
20
Electric Lighting Fixtures
14,944.82
25
15
Lighting & Controls - Yard
362.07
25
15
Water Heater
169.72
25
10
[12]Outside Feeder Lines 12,275.55
60
45
Total
$ 93,698.01
Warehousing & Manufacturing
Facilities
Craneways, Structural
Steel
$ 39,518.55
25
25
Pits, Concrete-Machinery
524.60
25
20
Flagpole, Kitchen Sink
Service, Portable
Lavatory Dividers, &
Pads, Concrete-Machinery
2,983.00
25
15
Portable Planters, Water
Coolers, Range & Oven,
Portable Air-Conditioners,
Exhaust Fans, Folding
Door-Curtain,
Lavatory Accessories,
& Concrete Wheel
Stops
7,411.19
25
10
Total
$ 50,437.34
Land Improvements
[13]Storm Sewerage $ 409.39
60
45
[14]All Other 45,984.45
Total
$ 46,393.84
Roof Cover, Interior &
Exterior Finishes
Acoustical Ceiling
$ 3,259.70
40
20
Floor Covering
2,583.89
40
10
Gypboard Ceiling &
Partitions
7,408.12
40
15
Roof Cover
22,705.76
40
20
Vents
9,337.81
25
20
Wainscot, Marlite, Walnut
Panels & Ceramic Tile
1,788.77
40
20
Enclosure
3,255.58
25
20
Enclosure, Roof Screen
407.33
25
15
Railroad Sidings
6,605.80
25
25
Skylights, Roof
4,320.20
25
25
Total
$ 61,672.96
Grand Total
$578,342.35
*622 Huck Manufacturing Company
As used by
Cost
IRS
Petitioner
Building Structure
Total
$165,049.86
60
40
Building Service Systems
and Equipment
[15]Sewerage & Sprinkler $ 23,284.10
60
40
Water Pipe Lines-Exterior
604.97
60
25
Water Pipe Lines-Interior
827.86
60
20
Gas Pipe Lines
4,032.10
60
25
Air-Conditioning Ducts
4,057.58
60
25
Electric Lighting-Wiring,
Outlets & Controls
17,461.48
60
20
Electric Distribution Panels
2,900.69
60
25
Telephone Conduit
1,925.31
60
20
Electric Lighting Fixtures,
Yard Lighting, Heaters &
Heat Pump
36,968.23
25
15
Plumbing-Fixtures &
Connections
9,540.55
25
20
Back-Flow Preventer
540.23
25
20
Total
$102,143.10
Manufacturing Facilities
Telephone Outlets
$ 944.61
60
20
Well, Truck Loading-Concrete
4,681.66
25
30
Ducts
26,377.15
25
25
Electric Panelboard
3,957.81
25
20
Electric Power -
Transformer
and Protective
Enclosure
2,753.16
25
20
Air Compressor Pipe Lines
& Connections
5,739.83
25
20
Docket Levelers & Docklites
3,660.63
25
15
Dividers, Power Exhausters,
Equipment Outlets,
Aluminum Flagpole &
Wood Shelving
$ 4,028.92
25
15
Drinking Fountains, Pump
Sump, Exhaust Fans,
Vanities & Mirrors &
Lavatory Accessories
2,672.50
25
10
Total
$ 54,816.27
Land Improvements
[16]Storm Sewerage 60
40
[17]All Other Total
$ 23,307.45
Roof Cover, Interior &
Exterior Finishes
Acoustical Ceiling
$ 5,844.91
40
20
Floor Covering - Vinyl
Asbestos
2,847.63
40
10
Partitions, Concrete
Block
14,207.35
40
30
Partitions - Plywood, Drywall
& Lavatory
10,522.32
40
20
Roof Cover
10,683.65
40
20
Ceramic Tile
168.76
40
20
Wood Frame, Air-Conditioning
Support
629.39
25
20
Planters
557.19
25
20
Total
$ 45,461.20
Grand Total
$390,777.88
*623 Akron Service Center
As used by
Cost
IRS
Petitioner
Building Structure
Total
$885,398.88
60
50
Building Service Systems
and Equipment
Piping-Water
$ 12,468.69
60
25
Air-Conditioning Ducts
5,692.55
60
25
Electric Wiring
24,593.17
60
25
Switchgear
6,597.28
25
25
Lighting Conduits, Wiring
& Controls
60,784.63
60
20
Telephone Duct
811.14
60
25
Floodlighting -- Yard Area,
Plumbing -- Fixtures &
Connections, Transformers,
& Lighting
27,495.60
25
20
Electric Lighting Fixtures,
Air-Conditioning Units
and Infra Red Unit
Heater
60,897.97
25
15
Water Heaters
545.96
25
10
[18]Fire Protection System 129.614.08
60
50
Total
$329,501.07
Service Center Facilities
& Equipment
Loading Docks
$ 49,361.06
60
35
Telephone Outlets
1,235.43
60
15
Railroad Siding & Switches
7,008.08
25
25
Flagpole
1,192.79
25
20
Trucking Doors
14,630.70
25
20
Door, Records Vault
875.62
25
20
Electric Connections
13,724.92
25
20
Trucking Access, Storage
& Service
83,618.24
25
15
Concrete Pads
571.96
25
15
Smoke Vents
19,214.68
25
15
Dividers, Portable Lavatory
847.54
25
15
Rubber Truck Bumpers
$ 3,391.19
25
10
Exhaust Fans
5,132.03
25
10
Guard & Wheel Stops
1,518.29
25
10
Water Coolers
1,247.91
25
10
Lunch Room Cabinets
348.37
25
10
Lavatory Accessories
370.21
25
10
Total
$204,289.02
Land Improvements
[19]Storm Sewerage 60
50
[20]All other Total
$ 57,391.35
Roof Cover, Interior &
Exterior Finishes
Roof Cover, Acoustical
Ceiling, Partitions
& Floor Covering,
Ceramic Title
$120,720.67
40
20
Floor & Wall Covering -
Vinyl Asbestos
2,725.64
40
10
Draft Curtains, Metal
31,878.88
25
25
Guard House
1,726.27
25
20
Total
$157,051.46
Grand Total
$1,633,631.78
*624 Mercedes-Benz of North America, Inc.
As used by
Cost
IRS
Petitioner
Building Structure
Total
$322,880.55
60
50
Building Service Systems
and Equipment
[21]Sewerage & Sprinkler $ 59,599.44
60
50
Water Pipe Lines
4,080.05
60
25
Gas Pipe Lines
1,242.47
60
25
Air-Conditioning Ducts
6,011.17
60
25
Electric Lighting--Outlets,
Wiring & Controls
23,865.66
60
20
Telephone Outlets &
Conduits
542.42
60
20
Switchgear, Panels &
Feeders -- Electric
Service
12,485.93
25
25
Plumbing -- Fixtures &
Connections
7,786.73
25
20
Air-Conditioners, Heaters
& Exhaust Fans
15,803.70
25
15
Electric Lighting Fixtures
17,131.77
25
15
Water Heater
385.81
25
10
Total
$148,935.15
Service Center Facilities
& Equipment
Concrete Pit
$ 14,524.92
25
20
Aluminum Flagpole
883.63
25
20
Industrial Waste Systems
5,224.00
25
20
Concrete Pits
2,437.24
25
15
Platform Support
835.92
25
15
Drives & Parking Areas
20,553.00
25
15
Asphalt Concrete Pad
15,245.66
25
15
New Car Preparation
System
2,211.14
25
15
Power Service Connections
& Controls
9,345.53
25
15
Compressed Air Service
Controls & Accessories
1,716.44
25
15
Fumes--Exhaust
$ 2,568.96
25
15
Power Operated Doors
5,386.82
25
15
Cabinets
749.84
25
10
Ventilators
4,135.02
25
10
Water Coolers
1,178.17
25
10
Lavatory Accessories
560.05
25
10
Carpeting
1,119.06
25
10
Total
$ 88,675.40
Land Improvements
[22]Storm Sewerage $ 659.61
60
50
[23]All Other 41,361.54
Total
$ 42,021.15
Roof Cover & Interior
Finish
Roof Cover, Acoustic
Ceiling & Partitions
$ 58,429.50
40
20
Floor Covering -- Ceramic
Tile
1,439.53
40
20
Floor Covering -- Asphalt
Title
2,321.08
40
10
Suspended Draft Curtains
3,374.80
25
25
Total
$ 65,564.91
Grand Total
$668,077.16
*625 Underground, copper piping (exterior piping) connects water mains in the street to the distribution systems for water in the various buildings located in WIC. The piping inside the buildings (interior piping) is, in part, in the walls and under the floors and, in part, between the suspended ceilings and the roofs. If there were any piping in an industrial area, it would be exposed in the overhead. Some portions of the interior piping feed various pieces of equipment that have relatively short useful lives. Overall, both exterior and interior piping will have useful lives equal to the building shell life; however, it might be necessary to replace a couple of feet of existing piping adjacent to fixture when changing the fixture or to abandon some piping when the useful life of the equipment it serves terminates. Like the water pipes, the exterior pipes supplying gas to the buildings at WIC are underground and the interior gas pipes are in the walls and under the floors or in the *626 overhead. The basic system for each building will have a useful life as long as the shell life of the particular building, although a small amount of existing gas piping probably will be replaced as some of the water piping will be replaced. Most of the electrical conduits, wiring, and controls in petitioner's buildings have lives as long as the building shells' lives. The electric distribution panels also have expected useful lives as long as the lives of the building shells. Some electric wiring that goes to individual pieces of equipment has a life equal to the life of the particular equipment. Petitioner assigned a composite life of 20 years to the electrical conduits, wiring, and controls, as well as to the electric distribution panels.
From a telephone line, the telephone service goes through metal conduits in the concrete tilt-up walls or in the concrete floors of petitioner's buildings. The wiring runs from the conduits to telephone backboards, located in the buildings. From the backboards, it runs to individual junction boxes installed by petitioner and to telephone outlets. Since the conduits are very difficult to change, they are unlikely to be changed during the *627 useful live of petitioner's building shells. The junction boxes also are unlikely to be changed during the useful lives of the building shells. In petitioner's buildings, only the office areas, which constitute approximately 3 percent of the total area of each building, are air-conditioned. The air-conditioning systems are comprised of freestanding air-conditioning units located on the roofs above the office areas. Duct work carries the cold air from the units to the areas to be cooled. Petitioner's buildings are required by code to be equipped with fire extinguishers and fire hoses. These items are kept inside fire hose cabinets. In industrial areas, the cabinets are affixed to the walls with screws. In office areas, the cabinets are recess mounted. OPINION The issues for decision are (1) whether the useful lives of various components of buildings depreciated on the component method of depreciation were as assigned by petitioner and (2) whether the composite useful lives of buildings depreciated on the composite method of depreciation were as assigned by petitioner.
The determination *628 of an asset's useful life is a question of fact. Matson Navigation Co. v. Commissioner,67 T.C. 938, 944 (1977); Casey v. Commissioner,38 T.C. 357, 381 (1962). The useful lives determined by respondent are presumptively correct, and the burden of proving them erroneous rests with petitioner. Casey v. Commissioner,supra.
The estimated useful life of an asset is determined within the guidelines of section 1.167(a)-1(b), Income Tax Regs.: Useful life, For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from *629 natural causes, (2) the normal progress of the art, economic changes, inventions, and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. * * * If the taxpayer's experience is inadequate, the general experience in the industry may be used until such time as the taxpayer's own experience forms an adequate basis for making the determination. The estimated remaining useful life may be subject to modification by reason of conditions known to exist at the end of the taxable year and shall be redetermined when necessary regardless of the method of computing depreciation. However, estimated remaining useful life shall be redetermined only when the change in the useful life is significant and there is a clear and convincing basis for the redetermination. Useful Lives of Building Shells
Petitioner maintains that it is entitled to a reasonable allowance for obsolescence on its buildings. Petitioner argues that in the case of a taxpayer engaged in the land development business, such as itself, the *630 current and reasonably anticipated rates of return on the taxpayer's investment are to be considered in assigning a date of economic obsolescence before the expiration of the depreciable asset's normal useful life in the hands of a taxpayer not in the land development business, citing Hastings v. United States,279 F. Supp. 13 (N.D. Cal. 1967). More specifically, petitioner would have us find that, as a result of conditions about which Earl Metcalfe (Metcalfe herein) testified that were known to exist and anticipated by land developers during the years in issue in Los Angeles County, it has shown an intended abandonment (see Zimmerman v. Commissioner,67 T.C. 94, 107 (1976)) to enable it to benefit from the opportunity to generate a greater rate of return on its investment.
Deductions for obsolescence afford the taxpayer an opportunity to recover the basis of an asset if he establishes that depreciation deductions will be insufficient to restore to him such basis because the life of the asset has been shortened by reason of it having become useless for *631 performing the function it once served. Zimmerman v. Commissioner,supra at 104-107. See section 1.167(a)-9, Income Tax Regs.[24] The Court of Appeals for the Ninth Circuit, to which this case is appealable, requires that, to meet his burden of proof, the taxpayer establish to a "reasonable approximation" the existence and the amount of obsolescence. Ames v. Commissioner,626 F.2d 693 (9th Cir. 1980), affg. T.C. Memo. 1977-249; Western Terminal Co. v. United States,412 F.2d 826, 827 (9th Cir. 1969). Cf. Airport Building Development Corp. v. Commissioner,58 T.C. 538, 541-542 (1972) (applying a more stringent standard, i.e. "practical certainty"). We find it unnecessary to decide whether we agree with the less stringent standard of reasonable approximation or whether we are bound to apply the rule of Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), because we are satisfied that petitioner has failed to carry its burden of proof that the less stringent standard has been satisfied. *632 We must initially determine the physical useful lives of the buildings in question. Then, we can determine whether petitioner has established that the buildings will be obsolete prior to the termination of their physical useful lives. Ames v. Commissioner,T.C. Memo. 1977-249, affd. 626 F.2d 693 (9th Cir. 1980); Dunn v. Commissioner,42 T.C. 490 (1964). The appraisal reports prepared by American Appraisal for petitioner fail to address, as such, the physical useful lives of petitioner's buildings. Instead, the useful lives reflected in these reports were determined by considering economic factors that would shorten the useful lives of the buildings. [25] Petitioner has, thus, failed to establish shorter physical useful lives for the building shells than those determined by respondent. We find nothing unreasonable in respondent's determinations as modified in his brief. [26]
*633 We, accordingly, decide next whether petitioner has established to a reasonable approximation that the building shells were becoming economically obsolete and will be obsolete prior to the expiration of their physical useful lives. Metcalfe identified the market segment served by petitioner as consisting of some 250 square miles. The boundaries of the area identified by Metcalfe are the Santa Monica Mountains on the north side, the Pacific Ocean on the west and the south sides, and a line drawn from the Civic Center in downtown Los Angeles to the southeast corner of Los Angeles County on the east side. Metcalfe testified that by 1973 and 1974 substantial increases in the value of industrial land in southern California were causing developers of land in the described area to phase out their construction of the type of tilt-up structures located in WIC. During the years before us, construction for residential, commercial, office, and light industrial uses preponderated over construction for medium and heavy industrial uses. However, some of the parcels that were developed for residential, commercial, office, or light industrial uses were surrounded by neighborhoods that differed *634 substantially from the industrial neighborhoods adjacent to most of WIC. [27] In addition, the impetus behind some construction for nonindustrial or light industrial uses was redevelopment plans instituted by various cities in Los Angeles County. [28] For these reasons, although we were impressed with Metcalfe's extensive knowledge of land uses in Los Angeles County, we do not believe that petitioner has demonstrated that its buildings were becoming obsolete during the years in issue. *635 As noted, WIC is zoned W-4, which generally permits industrial uses of the type that would be obnoxious to neighbors. Moreover, lands predominantly used for industrial purposes border WIC on three sides. According to petitioner's "Fact Sheet" on WIC, over 53 percent of the City of Carson, in which WIC is located, is devoted to industrial development. No evidence was adduced indicating that the city has any plans for redevelopment. Most importantly, the construction by Cabot, Cabot, and Forbes, one of the larger real estate mortgage and development companies in the United States, of a development similar to WIC that was completed from 1974 to 1975 and is located a short distance to the north of WIC belies petitioner's theory that its buildings were becoming economically obsolete in the years in issue. Indeed, it confirms respondent's contention that, by virtue of its proximity to amenities like the deep water ports of Los Angeles and Lond Beach Harbor and two airports, the location of WIC, unlike the location of other properties that Metcalfe mentioned in his testimony, is particularly suitable for industrial use. Hastings v. United States,279 F. Supp. 13 (N.D. Cal. 1967), *636 is, we believe, inapposite. That case concerned the useful lives of various assets comprising three buildings. Each of the buildings was acquired by the partnership in Hastings, in which the taxpayer had an interest, solely to meet the particular needs of specific tenants for cheap, bulk space. The partnership could obtain the leases for the respective buildings only by competing with buildings anywhere from 25 to 35 years old. Thus, none of the buildings were intended to compete with the modern office buildings in the prime commercial area where they were located; modern features were absent from the buildings. Moreover, the floor space was insufficient to permit the partnership to maximize the ratio of the revenue produced to the value of the lot, which experts agreed had substantially increased and would continue to increase. Based on the foregoing factors, the District Court found that the alleged plan of the partnership to replace the buildings within the useful lives assigned by it was credible. Hastings v. United States,supra at 15. Here, there is testimony indicating that, as a result of an increase in the value of land in the vicinity of *637 WIC between 1965 and 1973 but no commensurate rise in monthly rental fees on the type of buildings at issue herein, a developer who constructed such buildings would expect to receive a lower rate of return on his investment in land in 1973 than in 1965. [29] However, petitioner has favored us with no expert testimony or other evidence that the rate of return that can be generated will likely continue to decrease, rather than increase.Cf. Hastings v. United States,supra at 15 and Adda, Inc. v. Commissioner,9 T.C. 199, 210 (1947), affd. 171 F.2d 367 (2d Cir. 1948). Subsequent to 1973 conditions could very well have changed so that land values in the vicinity of WIC would become stable or decrease. Moreover, monthly rental fees for the type of buildings owned by petitioner may either increase proportionately faster than land values or increase while the value of land remains relatively constant. There may simply be a time lag between the increase in land values and a rise in rental fees. Thus, it is entirely possible that petitioner's buildings can generate a sufficient rate of return on its investment in the future. *638 In accordance with the foregoing, we are not prepared to say that petitioner has established that the useful lives of its building shells had been shortened by obsolescence in the years before us. Therefore, respondent's determinations respecting the useful lives of the building shells, with such adjustments as are provided in his briefs, must be sustained. Useful Lives of Components
Respondent contends that all components in the buildings at WIC (not including land improvements) should be given a useful life of at least 25 years. He further contends that the following building components to which petitioner did not assign useful lives equal to the useful lives of the respective building shells should be assigned lives of such length: exterior piping (gas and water), interior piping (gas and water), air-conditioning ducts, electric distribution panels, electric lighting system (other than fixtures), telephone conduits and outlets, fire hose cabinets, and loading ramps. Finally, respondent contends that the roof and interior finishes should have been assigned useful lives of 40 years. In support of his position that certain components should be assigned useful lives *639 of at least 25 years, respondent highlights petitioner's policy as to repairs, renewals, and replacements. Section 1.167(a)-1(b), Income Tax Regs. He maintains that, in light of the specific provisions in the leases here involved placing the financial burden for repairs, renewals, and replacements on the lessees, [30] part of the loss from wear and tear of particular components will not be sustained by petitioner. Relying upon Kem v. United States,432 F.2d 961 (9th Cir. 1970), respondent argues that since the lease terms have affected the reasonably anticipated economic loss of petitioner, the useful lives of the building components must be computed with regard to these terms. Petitioner takes the position that, as a general rule, the useful life of leased property, rather than the length of the lease, is determinative of the period over which depreciation should be taken, relying on Zelco, Inc. v. Commissioner,331 F.2d 418 (1st Cir. 1964), vacating and remanding 40 T.C. 326 (1963); Lamson Bldg. Co. v. Commissioner,141 F.2d 408 (6th Cir. 1944); Alaska Realty Co. v. Commissioner,141 F.2d 675 (6th Cir. 1944) *640 and section 1.167(a)-4, Income Tax Regs. Petitioner further argues that the foregoing rule is only inapplicable where the lease terms obligate the tenant to maintain the property in such condition that the landlord will suffer no economic loss. Respondent, based on his Rev. Rul. 62-8, 1962-1 C.B. 31, agrees with petitioner that petitioner's leases impose no such obligation, inasmuch as its leases do not protect it against loss from obsolescence.
*641 Alaska Realty Company is readily distinguishable from the present case. In Alaska Realty Company, the Commissioner claimed that the taxpayer-lessor was entitled to no deductions for depreciation because the lease required the lessee to bear the cost of all repairs and replacements. The Court of Appeals for the Sixth Circuit held that, since the lease provisions imposed no obligation on the lessee to return the leased property at the expiration of the lease in the same condition as it was at the beginning of the lease, the taxpayer was entitled to deductions for depreciation. The period over which the deductions for depreciation should be claimed was not addressed by the court. Here, respondent has allowed petitioner deductions for depreciation, but over longer useful lives than those claimed by petitioner. In Zelco, Inc., this Court held that the taxpayer, who was engaged in the business of leasing trailers and trucks to an interstate motor carrier (the lessee), was required to depreciate the cost of its tires over the lives of its leases as extended. All relevant leases in that case were for a 1-year period and gave the lessee three successive options, which *642 the lessee exercised, to extend the lease for additional 1-year periods. The lease agreements required the lessee to furnish "all such tires * * * as may be required." The Court of Appeals for the First Circuit reversed our opinion based, in part, upon (1) the regulation's mandate that the cost of a capital asset, if subject to depreciation, be recovered over the estimated life of the asset without regard to the duration of the lease ( sec. 1.167(a)-4, Income Tax Regs.) and (2) the difficulties created for the taxpayer by our opinion since, as a result of the renewal options contained in the leases, the taxpayer could not tell how long its leases were going to be. As a third ground for its reversal of our opinion in Zelco, Inc., citing and relying upon Alaska Realty Co. v. Commissioner,supra and North Carolina Midland Railway Co. v. United States,143 Ct. Cl. 30, 163 F. Supp. 610 (1958), the First Circuit stated that this Court's concentration on the lease provision requiring the lessee to replace such tires as necessary was misplaced. In the instant case, respondent's position is not inconsistent with the *643 regulations, as he does not seek to have any components depreciated over the life of the lease pertaining to the building in which they are located. Nor would our adoption of respondent's position here force petitioner to determine how long its leases will last beyond the initial period to which they are applicable. In Zelco,Inc., we found the Alaksa Realty Co. case to be inapposite for the same reasons as indicated above. In so doing, we stated: The question in the Alaska Realty case was whether the lessor was to be allowed any depreciation upon the leased property; here, petitioner is plainly entitled to depreciate its investment in the entire vehicle, including tires, the only issue being whether it may take a disproportionately large amount in respect of the first year. [40 T.C. at 329] Likewise, in North Carolina Midland Railway v. United States,supra, the question presented was whether the lessor was entitled to any deduction for depreciation of the leased property.
Depreciation accounting is primarily intended to promote *644 the integrity of annual income statements by allocating in a meaningful way the cost entailed in using an asset (excluding maintenance expense) to the years to which it contributes. Massey Motors, Inc. v. United States,364 U.S. 92, 104 (1960). The depreciation deduction should permit the taxpayer to recoup his loss, without giving him a profit. Massey Motors, Inc. v. United States,supra at 101; Kem v. Commissioner,51 T.C. 455, 460 (1968), affd. 432 F.2d 961, 963 (9th Cir. 1970). Thus, petitioner should not have the benefit of depreciation deductions with respect to the entire cost of a component over the period of the component's physical life, if petitioner has not sustained the loss of the entire component at the end of its physical life and the component continues to produce rental income. The factual question whether petitioner will sustain the loss of its components at the end of their physical lives hinges on our construction of the lease provisions, and our findings as to the practical effect of these provisions. See Kem v. Commissioner,supra.
Here, the tenants, upon termination of their *645 leases, are required to surrender the leased premises and all buildings and improvements thereon in proper and efficient operating order. Yet, pursuant to the leases, petitioner has no obligation to make any replacements or renewals with respect to the demised premises. As a result of these two lease provisions, if a component wears out during the term of a lease, it must be replaced by the lessee. Indeed, petitioner, in its reply brief, admits its "lessees, rather than petitioner, were required to incur capital expenditures upon the exhaustion of assets during their lease terms." Therefore, at the end of a lease term, petitioner's loss is the difference between the cost of a particular component and the value of the component's replacement surrendered at the expiration of the lease. In addition, the cost initially incurred by petitioner for a component benefits petitioner in years beyond the actual physical life of the original component. To allow petitioner to depreciate the cost of its components over their physical lives would, thus, result in a distortion of income. Petitioner has steadfastly maintained that the lease provisions had no affect on the useful lives of the building *646 components. Consequently, it has presented no evidence to establish that respondent's position that the useful lives of all components was extended to at least 25 years as a result of the lease provisions is in error. [31] We, accordingly, hold that the minimum useful life of any component (not including land improvements) is 25 years. P. E. Deibel (Deibel herein) and John Eubanks (Eubanks herein), who testified respecting the useful lives of various components on behalf of petitioner and respondent, respectively, both impressed us as *647 intimately familiar with the buildings in question and well qualified to render an opinion as to the useful lives of the various components. As we stated at trial, given the expertise of these men, a far more satisfactory resolution of this case could have been reached by the parties through settlement. Nevertheless, the parties have insisted that this Court, which professes no particular expertise in determining useful lives, resolve the matter. In making our findings as to the useful lives of those components for which respondent urges useful lives equal to the lives of the building shells and those components for which he urges 40-year useful lives, we have carefully considered the testimony of the expert witnesses for both parties. We have also considered our earlier holding that since the lease provisions have the practical effect of decreasing the reasonably anticipated economic loss of petitioner, the useful lives of the building components for purposes of depreciation accounting are greater than the physical useful lives of the components. We hold that the useful lives of the components listed below are as indicated: Components
Useful Life (Years)
[32]Exterior Piping (Gas & Water) Same as useful life of building shell
[32]Interior Piping (Gas & Water) Same as useful life of building shell
[32][33]Air-conditioning ducts , Same as useful life of building shell
Electric lighting system (except
[32]fixtures) Same as useful life of building shell
[32]Electric distribution panels Same as useful life of building shell
Telephone conduits and
[32]outlets Same as useful life of building shell
Fire hose cabinets located
[34]in office areas Same as useful life of building shell
Fire Hose cabinets located
[34]in industrial areas 25
Loading Ramps & Docks used
in connection with warehousing
[35]facilities 45
Loading Ramps & Docks used
in connection with manufacturing
[35]facilities 35
Roofs, 3-Ply
25
Roofs, 5-Ply
30
Interior Finishes
25
*648 *649 Composite Useful Lives
Petitioner adopted useful lives of 30 years for its buildings, including land improvements, depreciated on the composite method of depreciation. Respondent contends that petitioner should have assigned composite useful lives of 50 years to its concrete tilt-up buildings, 40 years to its metal buildings, and 20 years to the land improvements. In the alternative, respondent contends that should we find that the land improvements should be grouped with the buildings, then we should hold that the concrete tilt-up buildings and the metal buildings have composite useful lives of 48 years and 39 years, respectively. As respondent admits, the grouping of assets consisting of building components and land improvements into a single composite account is permissible. [36] Respondent has not argued that we should depart from the grouping selected by petitioner and we see no reason to do so in this case.Hence, as we see it, we must determine the correct useful lives of petitioner's buildings including land improvements depreciated under the composite method. *650 After having considered the record as a whole and our foregoing holdings as to the useful lives of various components in petitioner's buildings, we have concluded, and hereby find as facts, that petitioner's concrete tilt-up buildings including land improvements depreciated on the composite method have useful lives of 47.75 years and that petitioner's metal buildings including land improvements depreciated on the composite method have useful lives of 38.3 years. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. An exception is provided by Article XIII of the lease. (See paragraph 9.5 of the foregoing excerpts from the lease.) The exception is applicable only in the event of a partial condemnation of the demised premises.↩
3. Of the seven buildings for which appraisal reports were prepared, only two were not of concrete tilt-up type construction: the Cormier Chevrolet Company Building and the Winchester Inn. Respondent has conceded that petitioner has correctly determined the useful lives of the components in the Cormier Chevrolet and Winchester Inn buildings.↩
4. The parties have stipulated that, for its taxable years 1973 and 1974, petitioner deducted for building depreciation the amounts of $818,919 and $1,190,723, respectively. Schedules attached to petitioner's 1973 and 1974 Forms 1120, however, show building depreciation deductions of $818,660 and $1,195,627.↩
5. In addressing the useful life of petitioner's buildings, the report indicated that each of petitioner's buildings had a composite useful life of 60 years.↩
6. Respondent originally claimed that the useful life of the shell of each building depreciated on the component method was 60 years. Since petitioner had only a 55-year ground lease on the property on which the J.W. Carroll & Sons, Inc. facility was located, respondent has now conceded that the useful life of the building shell of the original J. W. Carroll facility should be 55 years and that the useful life of the building shell of the addition thereto, which was constructed 4 years later, should be 51 years. ↩
7. The parties agree that the useful lives of the indicated components are equal to the life of the building structure. ↩
8. See footnote 7, supra.↩
9. Respondent has conceded that the useful lives of all land improvements, other than storm sewers, should be as claimed by petitioner.↩
10. The parties agree that the useful life of this component is equal to the useful life of the building structure. ↩
11. See footnote 9, supra.↩
12. The parties agree that the designated components have useful lives equal to the life of the building shell. ↩
13. See footnote 12, supra.↩
14. See Footnote 9, supra.↩
15. The parties agree that the useful lives of the designated components are equal to the useful life of the building structure.↩
16. See footnote 15, supra.↩
17. See footnote 9, supra.↩
18. The parties agree that the useful lives of the designated components are equal to the useful life of the building structure.↩
19. See footnote 18, supra.↩
20. See footnote 9, supra.↩
21. The parties agree that the useful lives of the designated items are equivalent to the useful life of the building structure. ↩
22. See footnote 21, supra.↩
23. See footnote 9, supra.↩
24. See Clayton v. Commissioner,T.C. Memo. 1981-433; Ames v. Commissioner,T.C. Memo. 1977-249, affd. 626 F.2d 693↩ (9th Cir. 1980).
25. As indicated in our findings of fact, the reports were expressly prepared for the purpose of formulating an opinion as to the estimated normal economic useful life expectancy of each component. ↩
26. We find it unnecessary to discuss the evidentiary value of respondent's Engineering Study of Building Compondent Useful Lives of Twnety-Eight (28) Industrial Buildings Located in Metropolitan Los Angeles, California, as of December 31, 1973, insofar as it recommends a useful life of 65 years for building shells. Suffice it to say that the other publications relied on by respondent's expert do support the useful lives determined by him. The failure of these other publications to address special conditions applicable to a particular taxpayer, which accelerate obsolescence, do not render them deficient, in any way, for purposes of assigning a physical useful life to the building shells.↩
27. A brief description of the parcels referred to by Metcalife that are adjacent to neighborhoods which differ substantially from the areas adjacent to WIC and the heighborhoods adjacent to such parcels follows. A narrow strip of land (approximately 2,600 feet wide) along Olympic Boulevard in Santa Monica, which was converted from industrial use to commercial use, is bordered on both sides by residential neighborhoods. The area on the north side of the Santa Monica Airport, which previously was the site of the Douglas Aircraft Company factory, but now is used for residential and commercial purposes, is bound on its east and north sides by residential neighborhoods. The former location of the Fox Hills golf course, where development oriented toward research and development and office uses was commenced after 1974, adjoined the area where the city of Culver City had instituted its redevelopment plan in 1970 (see footnote 28 infra↩). Acreage where multi-family dwellings, hotels, and shopping centers were constructed at the end of the Marina Freeway is adjacent to Marina del Ray, an area devoted to restaurants, apartments, and service and marine-related facilities. 28. Redevelopment programs, which involved the demolition of industrial buildings and their replacement by commercial, residential, or office developments, were instituted by the cities of Culver City, Inglewood, and Torrance.↩
29. Metcalfe testified that the cost of constructing buildings of the type in issue herein, the selling price of land in the vicinity of WIC, and the monthly rental fee being charged under net, net, net leases were as follows: 1965
1973
Cost of basic structure
$6/square foot
$10/square foot
Selling price of land
30-40"/square foot
$1.50-2/square foot
Monthly rental fee
7-8"/square foot
8-8 1/2"/square foot
(based on the floor space
of the building)
Petitioner's buildings average 125,000 square feet in size and cover approximately 45 to 50 percent of the developed land area. Therefore, if petitioner had entered into leases in 1973, its rate of return on its investment in developed land would have been at least 71 percent lower than if it had entered into leases in 1965, as shown below: ↩
1965
1973
Revenue: 125,000 X applicable monthly
$105,000
$127,500
rental fee of 7" and 8 1/2",
respectively X 12
Investment base: 250,000 X selling price
100,000 375,000 per square foot of land
of 40" and $1.50,
respectively
Rate of return: revenue / investment base
105% 34% 30. Petitioner, as lessor of the subject properties, had no obligation to maintain the demised premises, nor to make any repairs, replacements, or renewals thereto. Rather, the lessees were required, under the terms of net, net, net leases that petitioner entered into with them, to maintain the demised premises in a clean and orderly condition and in proper and efficient operating order. In the event that a leassee failed to so maintain and repair the premises, 10 days after giving the lessee written notice indicating the repairs or maintenance to be effected, petitioner was entitled to enter the demised premises to have the maintenance or repairs performed and thereafter invoice all repair and maintenance costs, as additional rent, to the lessee. The lease terms further required that the lessees, upon termination of their respective leases, (1) surrender the premises in a "broom-clean" condition, with all buildings, improvements, and electrial, plumbing, and mechanical installations in good, safe, and fully operable condition, (2) fill any holes or openings made by them in the buildings' walls, roofs, or floors, and (3) if directed to do so by petitioner, remove any improvements made by them to the demised premises and restore the premises to their original condition.↩
31. Although the evidence shows, as pointed out by petitioner, that, from 1975 to 1979, several lessees failed to occupy their premises for the original terms of their leases (Exhibit 10), there is no indication that such lessees failed to otherwise adhere to the terms of their lease agreements. In any event, we note the following language in Kem v. Commissioner,432 F.2d 961, 965 (9th Cir. 1970): Only if the lessee breached the conditions of the lease could the taxpayer suffer a loss. And, if anything is settled in tax law, it is that the depreciation deduction is not available as insurance against a breach of contract.↩
32. The designated components were assigned composite lives by petitioner. Respondent contends that they have useful lives equivalent to the useful lives of the respective building shells. Although Deibel testified to the effect that the pipes and the electric and telephone components include some parts that service specific pieces of equipment and that will be abandoned or replaced at the termination of the useful lives of those pieces of equipment, no testimony was produced as to what percentage of the components would be changed. Deibel testified that the remaining portions of the pipes and electric and telephone components have useful lives equal to the lives of the building shells. We are unable to speculate as to what percentage of the pipes and the electric and telephone equipment will be replaced or abandoned. ↩
33. Deibel testified that the bulk of the duck work in connection with an air-conditioning unit would have to be replaced when the unit is replaced -- such testimony being in direct conflict with the testimony of Eubanks. Neither Deibel's testimony nor Eubank's testimony in this regard is explanatory, rather than conclusory. We, accordingly, conclude that petitioner has failed to sustain its burden of proof as to the useful life of this component. See Huene v. Commissioner,T.C. Memo. 1979-302, affd. per unpub. opinion 671 F.2d 503↩ (9th Cir. 1981). 34. Petitioner assigned a 15-year life to its fire hose cabinets. According to Deibel, this component is akin to furniture inasmuch as it is subject to wear and tear. On the contrary, Eubanks testified that the cabinets are not subject to wear and tear. Considering that the cabinents in the office areas are recess mounted, we find it difficult to believe that they would sustain much wear and tear. Given that the cabinets located in the industrial areas are mounted to the walls, however, Deibel's testimony respecting the cabinets is plausible with respect to them. The record contains no evidence as to what proportion of the amount paid by petitioner for fire hose cabinets represents the cost of cabinets located in industrial areas, as opposed to the cost of cabinets located in office areas. However, applying the principle of the rule announced in Cohan v. Commissioner,39 F.2d 540 (2nd Cir. 1930), which permits us to approximate the amount of an expense that we are convinced was incurred, we find that 95 percent of the amount paid for fire hose cabinets was paid for cabinets in industrial areas. See Estate of Lamberth v. Commissioner,31 T.C. 302, 319-320 (1958); Mayes v. Commissioner,21 T.C. 286, 290↩ (1953). 35. For its loading ramps and docks used in connection with its warehousing facilities, petitioner adopted 35-year useful lives.Those loading ramps and docks used in connection with its manufacturing facilities were assigned 25-year useful lives by petitioner. We believe that the testimony produced by petitioner relating to wear, tear, and abandonment of this component supports a useful life shorter than that urged upon us by respondent.↩
36. See section 1.167(a)-7, Income Tax Regs.↩, indicating that all the assets used in a business may be grouped together.